**FOR PUBLICATION**

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------X

In re:                                              Chapter 11
                                                    Case No. 00-4667(KG)
Montgomery Ward, LLC, et al.,

        Debtors.
---------------------------------------------------------X
MONTGOMERY WARD, LLC, et al.,

                                                    Adversary Proceeding

        Plaintiffs,

    v.                                              No. 02-9282 (RTL)

OTC INTERNATIONAL, LTD.,

        Defendant.
---------------------------------------------------------X

## **OPINION**

APPEARANCES:

MORRIS, NICHOLS, ARSHT & TUNNELL
Donna L. Culver, Esq.
Derek C. Abbott, Esq.
Daniel B. Butz, Esq.
Co-Counsel for Plaintiff

A.S.K. FINANCIAL, LLP
Joseph L. Steinfeld, Jr., Esq.
Karen M. Scheibe, Esq.
Co-Counsel for Plaintiff

SILVERBERG STONEHILL GOLDSMITH & HABER, P.C.
Kenneth R. Schachter, Esq.
Mitchell L. Kaplan, Esq.
Co-Counsel for Defendant

THE BAYARD FIRM
Kathryn D. Sallie, Esq.
Ashley B. Stitzer, Esq.
Co-Counsel for Defendant

## RAYMOND T. LYONS, U.S.B.J.[1]

Plaintiff sues to avoid preferential payments made within 90 days prior to the filing of

bankruptcy on December 28, 2000. The Defendant maintains that all payments were made in the

ordinary course and, therefore, not avoidable under 11 U.S.C. § 547(c)(2). Plaintiff responds

that a reduction in payment terms from 60 days to 30 days just prior to the preference period

prevents the payments from being ordinary.

Because: (1) Montgomery Ward continued its practice of weekly payments of vendor

invoices by due date; (2) Change in terms was ordinary between the parties; and (3) Defendant

continued to ship without reservation and never engaged in any collection activity, the court

finds the payments were made in the ordinary course and not avoidable.

## JURISDICTION

This court has jurisdiction under 28 U.S.C. § 1334(a) and (b), 28 U.S.C. § 157(a) and

(b)(1), and the Order of Reference from the United States District Court for the District of

Delaware. Additionally, this is a core proceeding that may be heard and determined by a

bankruptcy judge under 28 U.S.C. § 157(b)(2)(F) to determine, avoid or recover preferences.

---

[1] Raymond T. Lyons, U.S. Bankruptcy Judge, District of New Jersey; by assignment to the U.S. Bankruptcy Court, District of Delaware.

## FINDINGS OF FACT[2]

Montgomery Ward operated hundreds of retail department stores throughout the nation for more than a century. On July 7, 1997, it filed a petition under chapter 11 of the Bankruptcy Code in this district. A plan of reorganization was confirmed on July 25, 1999 and Montgomery Ward emerged as a wholly-owned subsidiary of GE Capital Corp. Its business plan called for increased sales and a store remodeling program to attract the modern consumer. Financing was arranged through loans from major banks as well as equity, debt and credit enhancements by GE Capital.

The reorganization did not meet GE Capital's expectations. Following its second disappointing Christmas season after reorganization, Montgomery Ward filed for bankruptcy a second time on December 28, 2000. The Debtor immediately announced its plan to liquidate and set out to do just that. A plan of liquidation proposed by the Creditors Committee was confirmed on August 6, 2002. A Plan Administrator, John L. Palmer, now controls the Debtor and has nearly completed his work.

OTC International, Ltd. ("OTC") is a jewelry wholesaler that sold fine gold and silver jewelry to Montgomery Ward. OTC's products are not branded and there are hundreds of vendors that sell comparable products. Their business relationship began before Montgomery Ward's first bankruptcy case. Prior to 1997, Montgomery Ward commanded the best credit terms from its vendors, including OTC who sold on 120-day terms. Upon entering bankruptcy in 1997, Montgomery Ward informed its vendors, including OCT, that it would buy on 30-day

---

[2] The findings of fact in the court's oral decision rendered September 8, 2005 are incorporated by reference.

terms. OTC acquiesced and continued to ship to Montgomery Ward on credit during the first bankruptcy case. While in the first bankruptcy case, Montgomery Ward informed its vendors it was changing terms to 60 days with a 2% discount effective April 9, 1998. OTC again acquiesced, except when the parties negotiated special terms on certain sales during Christmas 1998. Thirty-two invoices between October 19-27, 1998 had 30-day terms with a 4% discount. Upon exiting from reorganization, the terms of sale remained the same. For the 1999 Christmas season through the Summer of the following year, Montgomery Ward purchased from OTC on terms of 60 days with a 2% discount.

At the Las Vegas jewelry show in June 2000, Montgomery Ward's Chairman and CEO, Roger Goddu, met with Chuck Fortgang, principal of Montgomery Ward's largest jewelry supplier, M. Fabrikant & Sons, Inc. ("M. Fabrikant"). Mr. Goddu informed Mr. Fortgang that Montgomery Ward projected increased jewelry sales in 2000 and wanted to be sure the vendors could meet the demand. Mr. Fortgage told Mr. Goddu that the only limitation on his company's ability to supply jewelry was its own finances. If Montgomery Ward wanted to purchase more jewelry it could help itself by shortening its payment terms. The faster the wholesalers got paid the more jewelry they could manufacture to restock Montgomery Ward's jewelry cases.

Mr. Goddu took this advice back to Montgomery Ward's Executive Committee. Although Montgomery Ward needed to maintain cash to meet a covenant in its loan agreement and the company's policy was to resist shortening vendor's terms, Mr. Goddu convinced the Executive Committee to shorten the payment terms from 60 days to 30 days with M. Fabrikant. This was approved at the end of June or beginning of July 2000. They anticipated that the reduction in terms would spread to other jewelry vendors.

4

OTC's principals also attended the Las Vegas jewelry show that June. Montgomery Ward's buyer, Rita Hamilton, was interested in some of the new designs OTC was showing. Following up after the jewelry show, in late July or early August, Yoram Sheinman, President of OTC and his nephew, Michael Sheinman, a salesman, flew to Montgomery Ward's headquarters in Chicago to meet with the jewelry buyers and book orders for the Christmas season. Ms. Hamilton introduced her new boss, Robert Baird, who touted Montgomery Ward's plan to increase jewelry sales in 2000. Both Mr. Baird and Ms. Hamilton were excited about OTC's sterling silver products and the prospects for growth. They asked what could be done to make jewelry sales bigger and better. Yoram Sheinman explained that silver jewelry sold in small units for low prices and required extra labor for handling, packaging and shipping. Mr. Baird, having been informed that the Executive Committee had authorized a reduction in terms for its largest jewelry vendor, asked if a similar reduction from 60 days to 30 days with an additional 1% discount would help OTC's capacity to supply. Naturally, OTC agreed. Yoram Sheinman said that would "speed up the pipeline" for goods. Every Christmas season OTC would reach, or exceed, its credit limit trying to sell as much merchandise as it could. Montgomery Ward's offer to reduce terms to 30 days would give OTC more availability under its credit line and allow it to supply more goods. A change in terms from 2%, 60 days to 3%, 30 days was implemented on August 23, 2000.

For OTC, the meeting in Chicago was strictly a sales call. Prior to the meeting, the Sheinmans never discussed Montgomery Ward's financial condition, accounts receivable from Montgomery Ward, terms of payment or anything to do with credit or collection from Montgomery Ward. Their only concern was booking sales for Christmas 2000 and into early

5

2001. The topic of payment terms was introduced by Montgomery Ward in the context of helping OTC meet Montgomery Ward's anticipated growth in the jewelry business. There was nothing remotely close to a suggestion, request or demand by OTC for a change in terms. Certainly OTC never threatened to withhold shipments of goods or impose a credit limit on Montgomery Ward. To the contrary, when met with the news that Montgomery Ward expected to increase its jewelry business, Michael Sheinman's response was that OTC had never disappointed a customer and would do its best to deliver all orders. It was in this context of excitement on both sides about increased business that Mr. Baird introduced the topic of reducing terms to facilitate production.

Several former Montgomery Ward employees testified about their dealings with OTC during 2000, including the buyer, Rita Hamilton, her boss, Robert Baird, the manager of accounts payable, Barbara McCready, and her supervisors, Timothy Watkins and Ted Penner. None of them could recall OTC ever requesting a reduction in terms, threatening to withhold shipments or engaging in any collection activity. Rita Hamilton, who attended the meeting with the Sheinmans in Chicago, could not recall much. Mr. Baird denied initiating a conversation to reduce OTC's credit terms. He said, in general, Montgomery Ward would not initiate that kind of an action. But, he could not even recall meeting the Sheinmans in Chicago. He recalled no discussion with Yoram Sheinman about a change in terms. He was "relatively sure" OTC's terms changed but he could not recall the details. On the other hand, Yoram and Michael Sheinman both have specific recollection that the reduction in terms was suggested by Mr. Baird without any prodding from them. Their testimony is detailed, credible and unrefuted.

OTC received orders for the Christmas 2000 season and shipped goods on time. OTC

6

never refused an order, delayed delivery or failed to fulfil an order. All Montgomery Ward's purchase orders for Christmas 2000 were filled by OTC. No shipments were made after November 2000, only because Montgomery Ward placed no further orders. In fact, OTC had merchandise in inventory expecting more orders from Montgomery Ward for December and early 2001. When Montgomery Ward closed its doors abruptly on December 28, 2000, OTC was stuck with this inventory and had to unload it elsewhere.

OTC did not engage in any collection activity, either during the preference period or before. OTC never sued Montgomery Ward, never sent a demand letter, never made collection calls outside normal account reconciliation. Neither did OTC place a credit limit on Montgomery Ward or tie delivery of goods to payment. OTC did not impose any payment plan on Montgomery Ward, and did not request collateral, other security or a guaranty. Unlike some other vendors, OTC never received detailed financial information from Montgomery Ward. OTC never requested financial information from Montgomery Ward, nor was it offered – except for the Vendor Letters. After reorganizing in 1999, Montgomery Ward's Chairman and CEO, Roger Goddu, adopted a practice of periodically sending letters to vendors with a status report. The purpose of these Vendor Letters was to encourage the shipment of goods on credit. The information was accurate, but presented with a positive spin. They portrayed Montgomery Ward as implementing a store remodeling program with the support of GE Capital and sufficient cash to carry it out. For example, Mr. Goddu wrote:

> We are in the midst of finalizing our remodel plans for 2000. At this time we anticipate converting at least 35 stores with a new objective to remodel some entire major metro markets by the third quarter in 2000. As soon as our plans are complete, we are looking forward to sharing this exciting news. *December 1999.*

7

Wards continues to be pleased and excited with our remodel store results and we are currently finalizing plans for our 2000 remodel program. There is a deep and shared commitment to continue to rebuild the quality of the Wards infrastructure. *December 1999.*

These actions will provide Wards with more than adequate funds availability to complete this year's remodeling program and fund new marketing and customer acquisition programs. *April 25, 2000.*

To help maintain the aggressive pace of our remodel activity, GE Capital has recently contributed $100 million in additional cash equity to Wards. This cash was used to pay down revolving debt and return our borrowing availability to approximately $150 million. This cash equity infusion did not require any lender approval. *July 13, 2000.*

There are two principal themes in this letter: 1) Wards is on track to achieve our Fall 2000 business plan. September sales were up 5%, which is consistent with our 4th quarter budget and 2) The continuing success of Wards remodel program is being supported by GE Capital Corporation, which allows Wards ample liquidity to execute our strategy. *October 6, 2000.*

Significant cash support has been provided by GE Capital Corporation, reflecting both their confidence in our aggressive remodel program and their continuing support of our turnaround efforts. *October 6, 2000.*

The need for the cash support was created by Spring results below plan, and a reforecast of Wards Fall business plan more aligned with Spring season trends. The resulting additional cash needs are being met by GE Capital to assure that Wards has the funds available to continue our remodel program and maintain adequate borrowing capacity to operate our business. *October 6, 2000.*

Again, we feel that the reforecast projections are very reasonable given Wards sales trends and are confident in our ability to achieve the Fall plan. *October 6, 2000.*

For 2001, Wards current plan is to remodel approximately 35 additional stores and a preliminary working list of candidate stores has been developed. However, depending on the 4th quarter

> results, we may announce an acceleration in remodel stores for
> 2001. The majority of these remodels will continue to be
> concentrated in completing entire markets. We have also engaged
> Thompson Associates to identify on a priority basis, new store
> fillbacks for five markets. We will share our 2001 store plan and
> our remodel list with you as it becomes final. *October 6, 2000.*

Less than ten weeks before filing bankruptcy, Montgomery Ward was projecting sufficient
liquidity and support from GE Capital to remain viable in 2000 and continue this store
remodeling program in 2001.

Montgomery Ward, for its part, continued its practice of weekly payment of vendor
invoices by due date. Montgomery Ward's processing of OTC's invoices was consistent with its
practice. Every Sunday those invoices that became due in the prior week, and that had all
supporting documentation such as delivery receipts, inspection, etc., were processed for
payment. Computer generated checks were issued each Monday and sent via U.S. Mail. The
amount of payment was tied to the invoices and numerous invoices were paid in one check. The
remittance advice accompanying this check would itemize the invoices paid. There were no
lump sum payments or payments on account. No payments were handled specially in order to
assure delivery of goods.

Montgomery Ward continued its practice of taking discounts to which it might not be
entitled or withholding payments where, for example, quantity could not be confirmed. After
further investigation, Montgomery Ward would pay for these unauthorized discounts or other
credits by including an amount for vendor charge backs in a check paying dozens of invoices.
These vendor charge backs were not tied to particular invoices and had to be applied on account.
This was consistent with historical payment practices by Montgomery Ward.

9

Each party performed a statistical analysis comparing this payment data from the preference period and an historical period. The data and the analysis were remarkably similar, except that Defendant computed the number of days from due date to check date, while Plaintiff used the days from invoice date to the date the check cleared Montgomery Ward's bank account. In the preference period, 85% of invoices by dollar amount were paid within 30 days after due date. Exactly the same percentage (85%) of invoices were paid within 30 days after due date in the historical period.

Montgomery Ward retained superior bargaining power throughout the relationship with OTC. Montgomery Ward was one of OTC's top customers representing a substantial portion of OTC's business. In contrast, OTC supplied a tiny fraction of Montgomery Ward's purchases and was not even one of its largest jewelry vendors. Negotiation of payment terms and discounts was a normal practice between Montgomery Ward and OTC, but OTC had no power to dictate terms. To the contrary, Montgomery Ward suggested a reduction in terms because it saw an advantage to itself.

During the preference period, Montgomery Ward issued 13 checks totaling $2,395,936.40 to OTC. Each check, save one, was issued on a Monday; in fact, Montgomery Ward issued a check to OTC on each Monday during the preference period starting with the first check on September 25, 2000 and the last check on December 18, 2000. Similarly, data going back to September 1998 shows that Montgomery Ward issued a check to OTC once a week. The only Monday where a check was not issued was November 6, 2000 when Montgomery Ward was experiencing system-wide computer problems and could not generate computer checks for any vendor. A manual check was issued on November 8, 2000 (Wednesday) for $12,358.77.

10

Each check cleared Montgomery Ward's bank within a week to ten days, except for a check dated October 9 that did not clear for 15 days. The largest check was for $865,371.67 that cleared on November 20, 2000. When Montgomery Ward filed bankruptcy on December 28, 2002, OTC's account was nearly paid in full, except for a small balance. OTC did not file a proof of claim in this case.

## DISCUSSION

Defendants stipulated all elements of a preference under 11 U.S.C. § 547(b). The only contested issues related to the ordinary course defense. Plaintiff stipulated that the debt was incurred in the ordinary course under 11 U.S.C. § 547(c)(2)(A). This adversary proceeding was tried in two phases. First there was a consolidated trial involving several defendants in the wholesale jewelry business ("Phase I").[3] That phase was limited to whether payments were made according to ordinary business terms under Section 547(c)(2)(C) of the Bankruptcy Code. The second phase ("Phase II") of this trial involved solely the Defendant OTC and whether the payments to it were within the ordinary cause of business between Montgomery Ward and OTC under Section 547(c)(2)(B).

In the consolidated trial, I found that defendants had proved that the payments were within industry standards. In the course of my decision, I tried to relate Montgomery Ward's situation to the policy behind the preference statute as articulated in the Third Circuit's opinion

---

[3] Eight adversary proceedings involving nine defendants were consolidated regarding common issues and facts. Four defendants settled before trial. Five defendants participated in the consolidated trial, including OTC and M. Fabrikant & Sons, Inc. Plaintiff settled with two defendants after the decision in Phase I. Fabrikant and related companies settled after their Phase II trial but before the court rendered a decision.

in *Fiber Lite Corporation v. Molded Acoustical Products, Inc., (In re Molded Acoustical*

*Products, Inc.)*, 18 F.3d 217 (3d Cir. 1994). Specifically, the court instructed,

> On the one hand, the preference rule aims to ensure that creditors
> are treated equitably, both by deterring the failing debtor from
> treating preferentially its most obstreperous or demanding
> creditors in an effort to stave off a hard ride into bankruptcy, and
> by discouraging the creditors from racing to dismember the debtor.
> On the other hand, the ordinary course exception to the preference
> rule is formulated to induce creditors to continue dealing with a
> distressed debtor so as to kindle its chances of survival without a
> costly detour though, or a humbling ending in, the sticky web of
> bankruptcy.

*Id.* at 219.

> We think ordinary terms are those which prevail in healthy, not
> moribund, creditor-debtor relationships.

*Id.* at 227.

With regard to Montgomery Ward, I said,

> • When the credit terms were renegotiated, Montgomery Ward was not moribund
> and not on a slide into bankruptcy. (Transcript of Court's Decision September 8,
> 2005, Page 7, Lines 6-8).

> • Montgomery Ward hardly exhibited morbidity, nor did it appear to be on the
> slide into bankruptcy from which it had emerged just the year previously.
> (Transcript of Court's Decision September 8, 2005, Page 27, Lines 12-14).

> • At all times following the first bankruptcy in August of 1999 until shortly
> before the second bankruptcy in December of 2000, Montgomery Ward's senior
> management ran the business as a going concern, expected it to continue as a
> going concern, and represented to vendors, including all the joint defendants, that
> it would be a going concern. (Transcript of Court's Decision September 8, 2005,
> Page 27, Lines 22-25, Page 28, Lines 1-2).

> • And as to the financial distress, as I said, the information that Montgomery
> Ward provided to its vendors indicated that it was not a company in financial
> distress during the time that the terms were renegotiated in June through August
> of 2000. (Transcript of Court's Decision September 8, 2005, page 39 at 18-22).

My findings were based the Vendor Letters portraying positive results for Montgomery Ward's store remodeling program and assuring vendors that, with the support of GE Capital, Montgomery Ward had the resources to carry through its plans for 2000.

**_Reconsideration_**

Plaintiff asks me to reconsider my findings based upon newly discovered evidence that confidential financial information showing negative performance by Montgomery Ward had been shared with one of the jewelry defendants - M. Fabrikant & Sons, Inc. Discovery from Fabrikant between Phase I and Phase II revealed that Michael Saffet, Fabrikant's CFO, had a folder with financial data Montgomery Ward had provided to a select group of vendors on a confidential basis. Mr. Saffet had forgotten about this folder when Fabrikant first responded to discovery. He found it in the interim and produced it.

First of all, the financial information was not newly discovered. It was created by, or for, Montgomery Ward. There was the audited financial statement for the year end December 31, 1999 prepared by the independent certified public accountants, Arthur Anderson, and the monthly financial statements prepared by Montgomery Ward's internal accounting staff. Randy Brown, Montgomery Ward's CFO during the preference period, testified at the consolidated trial (Phase I). In Phase II he confirmed that he has always had in his files, or could easily have located, all of the financial documents that were shared by Montgomery Ward with Fabrikant. If Plaintiff had made any effort to locate these financial statements, it could have obtained them.

What may have been newly discovered by Plaintiff's counsel was the fact that Fabrikant was privy to these financial statements. Of course, Montgomery Ward's personnel knew that they had sent these financial statements to Fabrikant. But, with the closure of Montgomery

13

Ward and the disbursal of Montgomery Ward's management personnel among the retail diaspora, Plaintiff's counsel may not have learned the complete story from their client. OTC objects to reconsideration arguing that there is no new evidence and the law of the cause doctrine. OTC is probably correct. Nevertheless, in the interest of accuracy, I will consider whether Fabrikant's possession of these financial statements would change my conclusion that Montgomery Ward did not exhibit financial distress.

Randy Brown, Montgomery Ward's CFO, testified at Phase II that scrutiny of the financial statements revealed negative information about Montgomery Ward's operations in contrast to the admittedly positive spin given by Montgomery Ward's management in the Vendor Letters. First of all, the audited financial statement for the four month period, starting on Montgomery Ward's exit from its first bankruptcy case in August 1999 to the end of that year, showed a loss of $31 million. The last quarter of the year is when a healthy retailer should be profitable. Furthermore, buried in footnote 5 is a cryptic description of an extraordinary transaction with Montgomery Ward's private credit cards that produced a $70 million gain. A savvy reader would eliminate this gain from the income statement and conclude that Montgomery Ward actually lost $100 million from operations at the end of 1999.

Reviewing the monthly financial statements prepared in house for February, March and April 2000, Mr. Brown pointed out that sales revenue failed to meet projections and losses exceeded projections. Furthermore, Montgomery Ward's loan agreement required a minimum liquidity of $75 million. An astute analyst could glean that Montgomery Ward came within $20 million of that $75 million minimum - an uncomfortable margin for a national retailer of Montgomery Ward's size.

14

Furthermore, Plaintiff points out that OTC has not challenged the statutory presumption that Montgomery Ward was insolvent during the preference period starting September 28, 2000. Therefore, argues Plaintiff, one could extrapolate that Montgomery Ward was likely insolvent on August 23, 2000 when OTC's terms were reduced. Plaintiff asks the court to reconsider and find that Montgomery Ward was on the slide into bankruptcy when it agreed to reduce terms with the jewelry vendors.

Arthur Anderson's audited financial report for 1999 had an unqualified opinion – a so called "clean opinion". Mr. Brown confirmed that if Arthur Anderson had concluded that Montgomery Ward might not have survived for the next twelve months, it would have included a "going concern" qualification to its opinion. In fact, Arthur Anderson was considering including a "going concern" qualification but Mr. Brown and the other senior management of Montgomery Ward successfully argued and ultimately convinced Arthur Anderson to issue a clean opinion.

The key factors leading to Arthur Anderson's acquiescence were the projections presented by Mr. Brown and his colleagues and the financial support GE Capital gave to Montgomery Ward, a wholly-owned subsidiary. Mr. Brown testified that Montgomery Ward consistently failed to meet management's projections and that GE Capital's willingness to provide support was not set in stone.

Mr. Brown testified that the information contained in the Vendor Letters was accurate, albeit with a positive spin. The purpose of the letters was to encourage suppliers to continue shipping goods to Montgomery Ward on credit - and they worked. Vendors, particularly the jewelry vendors, continued to accept orders and ship goods without interruption. Although a knowledgeable reader of the financial statements might have concluded that Montgomery

15

Ward's viability was shaky, his confidence would be buoyed by statements in the Vendor Letters such as

those quoted above at pages 8 to 9.

Furthermore, there is no evidence that anyone at Fabrikant actually analyzed the financial statements with a trained eye, such as Mr. Brown's (although Fabrikant's CFO, Mr. Saffet, certainly was capable, being an experienced certified public accountant). Nor is there any evidence that any of the jewelry defendants were motivated to request a reduction in terms because of the negative financial information that might have been discovered. The change in terms for the jewelry vendors was conceived by Roger Goddu at the Las Vegas jewelry show in June 2000. He presented his plan to Montgomery Ward's Executive Committee and sold them. His plan was implemented with Fabrikant immediately and among the other jewelry vendors within a few weeks thereafter, as had been anticipated. There was no concerted effort by the jewelry vendors to demand a change of terms. No individual vendor, nor group, brought any pressure to bear on Montgomery Ward. No order was refused, no shipment delayed - not even a threat or suggestion of withholding product. To the contrary, the jewelry vendors consistently desired to sell as much to Montgomery Ward as they could and acted accordingly. The change in terms was not preceded by any collection activity by the jewelry vendors - no suits, demands, collection letters or collection calls. Montgomery Ward was continuing to pay on a regular schedule. So long as their invoices were being processed and paid promptly none of the jewelry vendors exhibited any concern about payments. The only communication from the jewelry vendors to Montgomery Ward's accounts payable personnel were routine inquiries about missed invoices, discounts, credits and charge backs.

16

The second key factor identified by Mr. Brown was the support for Montgomery Ward from its owner, GE Capital. Mr. Brown speculated that if Arthur Anderson was asked to audit Montgomery Ward for the six months ended June 2000, it would be unlikely to issue a clean opinion absent a guaranty from GE Capital. In fact, GE Capital provided substantial support for Montgomery Ward starting with the financing that allowed Montgomery Ward to reorganize its first bankruptcy case in August 1999. Then in 2000, GE Capital increased Montgomery Ward's real estate financing and added $100 million to its guaranty of Montgomery Ward's bank debt. Later in July 2000, GE Capital infused $120 million of new equity in Montgomery Ward. As Montgomery Ward's senior management told its vendors:

> To help maintain the aggressive pace of our remodel activity, GE Capital has recently contributed $100 million in additional cash equity to Wards. This cash was used to pay down revolving debt and return our borrowing availability to approximately $150 million. This cash equity infusion did not require any lender approval. *July 13, 2000.*

> The continuing success of Wards remodel program is being supported by GE Capital Corporation, which allows Wards ample liquidity to execute our strategy. . . .

> The resulting additional cash needs are being met by GE Capital to assure that Wards has the funds available to continue our remodel program and maintain adequate borrowing capacity to operate our business. *October 6, 2000.*

To all the world, except a few *cognoscente*, it appeared as if GE Capital was committed to Montgomery Ward.

Having evaluated the additional evidence produced by Plaintiff at the industry phase of this trial, and considered the arguments of counsel, I see no reason to change my conclusions

regarding Montgomery Ward's financial condition.[4]

### Ordinary Course - Subjective Test

Section § 547(c)(2) was enacted in order "to leave undisturbed normal financial relations,

because they do not detract from the general policy of the preference section to discourage

unusual action by either the debtor or creditors during the debtor's slide into bankruptcy". 5

*Collier on Bankruptcy* P 547.04[2][a][ii][B] (Alan N. Resnick & Henry J. Sommer eds., 15th ed.

rev.).

> The purpose of Section 547(c) is to leave undisturbed normal
> financial relations between a debtor and its creditors, even as a
> company approaches bankruptcy. It protects "recurring, customary
> credit transactions that are incurred and paid in the ordinary course
> of business of the debtor and the debtor's transferee."

*United States Trustee v. First Jersey Sec., Inc. (In re First Jersey Sec., Inc.),* 180 F.3d 504, 512

(3d Cir. 1999)

While the ordinary course defense has three requirements, only one of them is at issue in

---

[4] The only finding I would change relates to the reasons a change of terms occurred for
Fabrikant. I found two reasons for the change: one, Mr. Saffet's visit to Chicago where he
inquired about credit insurance, that was no longer available, and received a suggestion of a
reduction in terms; and two, Roger Goddu's discussion with Chuck Fortgang at the jewelry
show. Mr. Saffet's testimony at Fabrikant's Phase II trial and the deposition testimony of Irene
Spector from J.P. Morgan Chase clarified that, not only did Mr. Saffet misinterpret the reason for
Ms. Spector's telephone call and mis-convey that message to Montgomery Ward; but the
suggestion by Montgomery Ward at the Chicago meeting of a possible reduction in terms had
nothing to do with the change that took place later. Upon his return to New York, Mr. Saffet did
nothing to follow up with Montgomery Ward on a possible change in terms. The issue died after
the Chicago meeting and played no part in the subsequent reduction in terms. The sole reason
Fabrikant's terms were changed to 30 days was Roger Goddu's conversation with Chuck
Fortgang and Mr. Goddu's belief that it was in Montgomery Ward's best interest to reduce terms
if it wanted to expand jewelry sales.

18

this case. Section 547(c)(2)(B) requires that the transfer was "made in the ordinary course of business or financial affairs of the debtor and the transferee." In applying the "subjective test" the court must consider the consistency of transactions between the debtor and creditor before and during the preference period. *First Jersey Sec., Inc.*, 180 F.3d at 512; *see also J.P. Frye v. Bradco Supply Corp.*, 891 F.2d. 66, 71 (3d Cir. 1989).[5] The burden of proof is on the Defendant to show that the transfer in question falls under the ordinary course defense. 11 U.S.C. § 547(g). Determining whether the disputed transaction is consistent with the course of dealing between the respective parties is an inherently factual analysis. *Cassirer v. Herskowitz (In re Schick)*, 234 B.R. 337, 348 (Bankr. S.D.N.Y. 1999). The Defendant must establish a "baseline of dealing" so that the court may compare the transfers made during the preference period with the parties' prior course of dealings. *Id.* Courts have relied upon several different factors in making a subparagraph (B) inquiry such as (1) the length of time the parties were engaged in the type of dealing at issue, (2) whether the subject transfer was in an amount more than usually paid, (3) whether the payments were tendered in a manner different from previous payments, (4) whether there appears any unusual action by either debtor or creditor to collect or pay the debt; and (5) whether the creditor did anything to gain an advantage (such as gain additional security) in light of the debtor's deteriorating financial condition. *Hechinger Liquidation Trust v. James Austin Co. (In re Hechinger Inv. Co. of Del., Inc.)*, 320 B.R. 541, 548 (Bankr. D. Del. 2004) *citing In re*

---

[5]The 2005 amendments to the Bankruptcy Code made the subjective test and the industry standard alternative defenses rather than conjunctive defenses. *Bankruptcy Abuse Prevention and Consumer Protection Act of 2005*, Pub. L. No. 109-8, § 409(1) (2005). Congress intended to make it easier for transferees to protect ordinary course payments.

*Allegheny Health, Education and Research Foundation*, 292 B.R. 68 (Bankr. W.D. Pa. 2003).

Where the parties have a long history of dealings, the focus is on those dealings; where the

parties have a short history of dealings, the creditor is required to fill the "gap" by reference to a

more extensive and exacting analysis of industry standards. *Forklift Liquidating Trust v. Spicer*

*Clark-Hurth (In re Forklift LP Corporation)*, 2006 WL 2042979 (D. Del.); *citing In re U.S.*

*Interactive, Inc.*, 321 B.R. 388, 392-393 (Bankr. D. Del. 2005).

> The term "ordinary" is not defined in the bankruptcy statute. J.P.
> Fyfe teaches the determination of what is "in the ordinary course
> of business" is subjective, calling for the Court to consider whether
> the transfer was ordinary as between the debtor and the creditor.
> Factors such as timing, the amount and manner in which a
> transaction was paid are considered relevant.

*First Jersey Sec., Inc.*, 180 F.3d at 512.

The billing and payment practices between Montgomery Ward and OTC remained

consistent and normal throughout the preference period. The only change was the terms of sale

went from 2%, net 60 days to 3%, net 30 days - i.e., the due date was shortened but the discount

was increased. Montgomery Ward continued its practice of printing checks to pay vendors every

Monday. It had thousands of vendors with a variety of due dates and organized invoices by due

date. Each Sunday those invoices that became due in the preceding week were processed for

payment.

OTC sent hundreds of invoices to Montgomery Ward. Apparently small packages of

jewelry were shipped separately and each shipment resulted in an invoice. All payments except

one during the preference period were by computer-generated check issued in Montgomery

20

Ward's regular weekly accounts payable process and delivered to OTC by U.S. mail. The one manual check was issued because Montgomery Ward's computer was not operating on that particular day. Each check from Montgomery Ward to OTC paid many invoices. The timing and manner of payment remained consistent during the preference period. As to amount, there were no lump sum payments or payments on account. The one large check for $865,371.67 in November 2000, although larger than any in the historical period, paid only invoices that were due. The large amount was attributed to the fact that OTC shipped a large amount of goods in the month before. There was no linkage to a credit limit or withheld goods.

In 1989, the Third Circuit took up an ordinary course defense case which required a substantial subparagraph (B) inquiry. *J.P. Fyfe, Inc. v. Bradco Supply Corp.*, 891 F.2d 66 (3d Cir. 1989). In *Fyfe*, the terms originally agreed to by the respective parties were 2% on the 10th of the second month following purchase, net 60 days. The debtor began to experience financial difficulty and the bank pulled its financing. The debtor then approached the creditor to discuss alternate payment arrangements and asked for net 90 days. While the creditor agreed to new terms, the debtor was unable to make any payments within the 90 day period. When the parties met a second time to discuss the situation, the debtor indicated that they were experiencing greater financial difficulties than the creditor had previously thought. The creditor initially threatened to suspend delivery to the debtor, but relented when the debtor made it clear that such action would jeopardize the debtor's survival. The parties then arranged to defer the debtors past debt of $500,000 indefinitely in exchange for payment of $130,000 per month applied against creditor's future deliveries. In addition, the creditor no longer dealt with the debtor on an open account basis, imposed a ceiling on the debtor's monthly purchases and would file liens and

notices in the event of any nonpayment. The Third Circuit ended up affirming the District Court decision finding that the creditor's imposition of a lump sum payment scheme and new terms and conditions upon learning of and in response to the debtor's financial deterioration constituted special treatment that precluded the creditor from claiming the ordinary course defense. *Id.* at 71-72. The courts understood the creditor's actions to be motivated out of its desire to stave off any losses associated with the debtor's insolvency. In this case, Debtor made no such representation to Plaintiff of its financial condition in renegotiating payment terms. Furthermore, Debtor was not required to make lump sum payments on deliveries in return for indefinite deferral of a large debt. Nor did the Debtor assume dramatically different payment terms as imposed by a creditor in response to Debtor's financial deterioration. In fact, this case presents just the opposite; Debtor asked Plaintiff for new terms in order to increase its own inventory. The changes in payment terms seen in *Fyfe* involved a creditor's reaction to knowledge of debtor's insolvency. The changes in the present case resulted from the logistical rather than financial needs of Debtor. The factual distinctions between *Fyfe* and the present case may serve as a model for determining which transfers fall inside or outside the ordinary course defense.

Plaintiff urges the court to hold that a reduction in terms just prior to the preference period is *per se* extraordinary. Plaintiff cites *Hechinger Liquidation Trust v. Universal Forest Products, Inc. (In re Hechinger Investment Co. of Delaware, Inc.)*, 326 B.R. 282, 285 (Bankr. D.Del. 2005), aff'd. 339 B.R. 282 (D.Del. 2006). In *Universal Forest*, the court held that the defendant failed to prove that the funds it received were nonavoidable under § 547(c)(2) because the activities giving rise to the disputed transaction were "so extreme and so out of character

with the long historical relationship between the parties" that they had to be considered preferential without defense. *Id.* at 292. The court noted that defendant "rarely imposed credit limits" on any of its debtors and that over the lengthy course of the relationship between the parties no credit limit had been imposed up until immediately before the preference period. In addition, the new terms imposed by the Defendant were quite severe. The debtor was required to begin making lump sum payments by wire transfer instead of check and its credit terms were reduced from 1% 10 days, net 30 to 1% 7 days, net 8. The court saw the change in the broader context of parties' relationship as a means for Defendant to limit its exposure to potential losses and allowed Plaintiff to recover.

While *Universal Forest* and the case at bar both involve a reduction in terms just prior to the preference period, the similarity ends there. *Universal Forest* presented a situation where a onetime reduction in terms was imposed by one party on the other, whereas this case is marked by several changes in terms over the course of the relationship between Plaintiff and Defendant. In fact, the previous changes in terms were dictated by Montgomery Ward who retained superior bargaining power throughout. The only change that was negotiated was the Christmas 1998 special situation. Recurrent negotiations to reduce or modify terms between parties are nonavoidable under § 547(c)(2) because their repetition throughout the business relationship tends to make them "ordinary". Onetime impositions of terms, however, may be deemed extraordinary. In fact, courts have distinguished cases from *Universal Forest* on this very basis. See *NSC Creditor Trust v. BSI Alloys, Inc (In re National Steel Company)* 341 B.R. 229, 237-8 (Bankr. N.D. Ill. 2006) (holding that the parties' customary renegotiation of contract terms fell under the ordinary course defense because "nothing had changed"). In addition, the debtor in

23

*Universal Forest* was forced to assume a dramatically different set of new terms than that which was agreed to by Debtor in this case. Plaintiff misconstrues the rationale underlying *Universal Forest*. An ordinary course defense analysis in the Third Circuit does not hinge solely upon the timing of a change in payment terms in relation to the preference period. Instead, courts are required to consider the change as it relates to the entire relationship over time between the parties. Here the reduction in terms was due to Montgomery Ward's desire to assure sufficient supply for its projected increase in jewelry sales, not by any concern over Montgomery Ward's viability.

Plaintiff says that since OTC's balance was negligible when Montgomery Ward filed bankruptcy, OTC manipulated the credit terms to limit its exposure to the detriment of other creditors. Actually, OTC was ready, willing and able to ship more goods to Montgomery Ward. The only reason it did not is Montgomery Ward failed to order more goods. OTC had no plan to reduce its exposure, "the Debtor simply ceased ordering product." *James Austin Co.* 320 B.R. at 545.

**Empirical Data**

Empirical data is useful in comparing the timing, amount and manner of payment from the preference and before. *Unsecured Creditors Committee v. Manufacturers Consolidation Service, Inc. (In re Color Tile, Inc.)*, 2000 WL 1373004 (Bankr. D.Del. 2000), *First Jersey Securities,* 180 F.3d at 512. Plaintiff contends that where payments made by the debtor to creditor in the preference period are shorter than those made in the historical period, the presumption arises of an extraordinary, avoidable transfer. Plaintiff analyzes the pertinent data

24

by comparing the invoice dates to check clearance dates[6] in the respective periods and claims that the difference in the payment cycle between the historical and preference periods sufficient to find extraordinary change. The Defendant uses the interval between the due date and the receipt of check; a method illustrating no significant change between the periods.

Comparing the pattern of payments during the preference period with the prior year shows that Montgomery Ward consistently paid over 85% of invoices within 30 days after due date.[7] Invoices paid outside this time frame were either unintentionally skipped by Montgomery Ward or delayed because Montgomery Ward had not completed its inspection, delivery confirmation or other documentation in its approval process. Frequently, Montgomery Ward took credits to which it was not entitled, a practice followed by other large retailers. OTC reconciled these credits resulting in Montgomery Ward reversing the credit and issuing a payment referred to as a vendor charge back. These VCB's were allocated to current invoices - sometimes skewing the pattern of payment. None of these payment practices was unusual.

OTC called as an expert in statistics Prof. Jack Williams of Georgia State University

---

[6] For purposes of the ordinary course defense the check clearing date is not the proper reference point – it is the check delivery date. *Rocin Liquidation Estate v. Pan-American Life Insurance Company (In re Rocor International, Inc.),* 339 B.R. 508, 515 (Bankr. W.D.Ok. 2006), *Official Committee of Unsecured Crditors v. CRST, Inc. (In re CCG 1355, Inc.),* 276 B.R. 277, 380, n.2 (Bankr. D.N.J. 2002), *Barnhill v. Johnson,* 503 U.S. 393, 396 and 401-402, n.9 (1992). Using the check clearing date would distort the statistics because of delay in depositing the check by the payee or within the banking system.

[7] Plaintiff's exhibit 53, columns J and K reflect the cumulative percentage by dollar amount of invoices paid during each five-day period following the invoice date. Column J for the preference period shows that by the end of 60 days after invoice date (i.e., 30-days past due) 84.95% of invoices had been paid. Column K for the historical period shows that by the end of 90 days after invoice date (i.e. also 30-days past due) 85% of invoices had been paid.

School of Law. Prof. Williams compared the payment patterns in the preference period with those in the historical period and found these entirely consistent with reference to the due date. The Plaintiff performed a similar analysis, but only comparing days from invoice date to payment. As would be expected, Plaintiff's analysis showed that Montgomery Ward paid thirty days faster from invoice date in the preference period. This was attributed solely to this change in terms from 60 days to 30 days.

There are several reasons to adopt the Defendant's past due date method over Plaintiff's invoice date method. First, the past due approach is preferred because it takes into account Debtor's method for processing invoices. Debtor's weekly check run was based on the due date appearing on each invoice. Such a method of payment makes sense, given that Debtor had thousands of vendors all engaged on different terms. The Plaintiff analyzes Debtor's payments without any consideration for the realities of its accounts payable practices. Second, the differential illustrated under Plaintiff's method is accounted for only by the change in terms. As it was common practice for the parties to adjust the terms over the history of their relationship, the change should not be viewed as out of the ordinary. Third, the software used to produce the Plaintiff's illustrations had to undergo substantial manipulation to reflect its contentions. Plaintiff produced a witness who was employed by its own attorneys who specialized in preference avoidance actions and use software specifically designed for preference payment scenarios. The report produced by the witness illustrates a change in Debtor's payment pattern based on the invoice date method. The software was designed to calculate the days past due and had a column for the payment terms. In order to come up with a report using the invoice date method, however, the witness had to "work-around" the software program's default scheme by

manipulating the due date and invoice date columns to mirror one another. As a result, the witness could produce data that conformed with Plaintiff's contentions. In short, the software used by specialists in analyzing preference actions (and relied upon by the Plaintiff) would have supported Defendant's claims but for the substantial manipulations of agents of the Plaintiff.

The same law firm represented the plaintiff in *Hechinger Liquidation Trust v. James Austin Company, (In re Hechinger Investment Co. of Delaware, Inc.)*, 320 B.R. 541 (Bankr. D.DE. 2004). In that case, plaintiff presented similar statistical analysis but included the actual credit terms in the data fed into its software. The resulting report focused on the credit terms and segregated the payments into small time periods all related to days past due (days late). *Id.* at 546-548. If Plaintiff's witness in the Montomery Ward - OTC case had used the actual credit terms in his software, rather than a "work-around", his report would have disclosed that the bulk of invoices paid during the preference period matched the bulk of invoices paid historically on a days past due basis.

Plaintiff quotes from Judge Morris Stern's decision *Official Committee of Unsecured Creditors v. CRST, Inc. (In re CCG 1355, Inc.)*, 276 B.R. 377, 383 (Bankr. D.N.J. 2002), "Median time intervals between invoice date and payment date, both before and during the preference period, are logical comparisons in making such an analysis." In that case, the credit terms were vague (60 to 90-day range), were not reduced to writing, and do not appear to have changed during the long history of dealings. Therefore, comparing the interval between payment and invoice date or due date would make no difference. Either calculation would reveal that the payments by CCG during the preference period were significantly later than the historical course

27

of dealing. Montgomery Ward - OTC is different because there was a change in terms that was respected by the parties.

In a post-trial submission, Plaintiff cites a recent decision by Chief Judge Sue L. Robinson, *Forklift Liquidating Trust v. Spicer Clark-Hurth (In re Forklift LP Corp.)* 2006 WL 2042979, (D.Del. 2006) for the proposition that the proper comparison is days from invoice to payment rather than days past due. Also, Plaintiff maintains that empirical evidence is sufficient to determine that payments were not ordinary.

*Forklift* is distinguishable because the credit terms never changed between the debtor and the defendant. Besides, the court related the days outstanding to days past due by noting that "Zero to 60 was as within terms, 60 to 90 is up to 30 days past due, and 90 to 120 is between 30 and 60 days past due." *Id.* As to the empirical data, in *Forklift* the shift in pattern of most invoices being paid within 60 to 90 days of issuance in the historical period verses more than 120 days in the preference period suggests abnormally where the terms were 60 days throughout. But in the Montgomery Ward - OTC situation where the terms changed, a past due analysis is more appropriate. Here the payment patterns were consistent between the historical and preference periods. The empirical data tends to support the ordinary course defense.

Plaintiff also argues that the actions taken by the Debtor leading up to the preference period constituted "unusual activity", which rendered the transfer extraordinary for the purposes of § 547(c)(2). The assertion that unusual activity between debtor and creditor in the preference period defeats an ordinary course defense is correct. But in making the determination of whether the transactions in this case constitute unusual activity, it is clear that the parties conducted

28

themselves in a manner best characterized as ordinary. One may refer, again, to the Third

Circuit's teaching in *Molded Acoustical Products:*

> Variations in credit terms within an industry demonstrate
> that the market is accommodating variances in buyers' and
> sellers' preferences or needs, at least when the parties deal
> at arms length and brandish equivalent bargaining power,
> and we do not think that Congress intended to hamper
> competition in this area more than necessary to accomplish
> its stated goal of curbing unusual behavior which impels
> bankruptcy and/or treats creditors inequitably....In short,
> we think that a trade debt payment made according to
> longstanding practice between two solvent parties most
> often does not "prefer" that creditor to the disadvantage of
> the debtor or other creditors. *Molded* at 225.

It should stand to reason that variations in credit terms between parties that routinely

adjusted or modified over the course of a lengthy business relationship does not constitute

extraordinary business practice. While unusual activity could defeat an ordinary course defense,

I find that the parties in this case have not engaged in sufficiently irregular transactions.

Plaintiff's expert, Holly Felder Etlin, opined, "[T]here was a substantial shift (to the detriment of

the Debtor) in the payment pattern in the Preference Period in which the Debtor was pressured to

make unusually high payments for the purpose of driving OTC's exposure to the Debtor to an

abnormally low level." There is absolutely no factual support that the Debtor was pressured by

OTC or that OTC had a purpose to drive down its exposure to the Debtor. Ms. Etlin's

conclusions are rank speculation based solely on numbers and not on actual events. The

evidence clearly showed that the change in terms was initiated by Montgomery Ward for its own

purposes and not because of any pressure by OTC or concern about Montgomery Ward's

financial condition.

## CONCLUSION

"[T]he court's general inquiry in these preference cases is to determine whether the payments to a creditor made in the 90 days preceding a filing for bankruptcy were in response to a zealous creditor's attempt to collect on a debt through preferential treatment ahead of other creditors, or an attempt by the debtor to maintain normal business practices in hope of staving off bankruptcy." *Troisio v. E.B. Eddy Forest Products US (In re Global Tissue LLC),* 106 Fed. Appx. 99, 102 (3d Cir. 2004). The weekly payments from Montgomery Ward to OTC during the preference period were consistent with historical practices. The change in terms that occurred more than a month before the preference period was not "in response to a zealous creditor's attempt to collect on a debt through preferential treatment ahead of other creditor." *Id.* Montgomery Ward's management made the change because they were convinced it would assure a ready supply of jewelry for their anticipated growth in jewelry sales. They hoped to stave off bankruptcy from which they had recently emerged. OTC continued to do business with Montgomery Ward on an ordinary basis, just as Congress meant to encourage by the ordinary course defense of 11 U.S.C. § 547(c)(2). Plaintiff is not entitled to avoid the payments to OTC during the preference period. Judgment will be entered for OTC.

September 12, 2006                              \_\_\_\_/S/ Raymond T. Lyons, USBJ\_\_\_\_