U.S. BANKRUPTCY COURT
FILED
TRENTON, NJ

06 SEP 22 AM II: 20

JAMES J. WALDRON

BY _____

DEPUTY CLERK

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

- - - - - - - - - - - - - - - - x
IN THE MATTER OF: :
                                : CASE NO.: 04-4667(RTL)
MONTGOMERY WARD, LLC, et al.,: Trenton, New Jersey
                                : July 19, 2006
            Debtor             :
- - - - - - - - - - - - - - - x
MONTGOMERY WARD, LLC, et al.,:
                                :
        PLAINTIFFS             :
                                : ADVERSARY PROCEEDING
        -vs-                    : NO.: 02-9282
                                :
OTC INTERNATIONAL, LTD.,        :
                                :
        DEFENDANTS             :
- - - - - - - - - - - - - - - x

TRANSCRIPT OF HEARING RE:  TRIAL TO RECOVER
PREFERENTIAL TRANSFERS

BEFORE THE HONORABLE RAYMOND T. LYONS
UNITED STATES BANKRUPTCY JUDGE

A P P E A R A N C E S:

For the Debtor:          ASK FINANCIAL, LLP
                         BY: JOSEPH L. STEINFELD, JR., ESQ.
                             KAREN M. SCHEIBE, ESQ.
                         2600 Eagan Wood Drive
                         Eagan, Minnesota  55121

For OTC International,    SILVERBERG STONEHILL
Ltd:                     GOLDSMITH & HABER
                         BY: KENNETH R. SCHACHTER, ESQ.
                             MITCHELL L. KAPLAN, ESQ.
                         111 West 40th Street
                         New York, New York 10018.


Audio Operator:          Betty Akin
- - - - - - - - - - - - - - - - - - - - - - - - - -
TERRY GRIBBEN'S TRANSCRIPTION SERVICE
27 Beach Road, Unit 4
Monmouth Beach, New Jersey 07750
(732) 263-0044 - Fax # (732) 263-0075

```
1                          I N D E X

2   OPENING STATEMENT                          PAGE

3        BY MR. STEINFELD:                        4

4   WITNESSES          DIRECT  CROSS  REDIRECT  RECROSS  COURT

5   YORAN SHEINMAN        14      52

6   MICHAEL SHEINMAN     108     132

7   LEE ROTHLINE         150     164    205      206     207

8                           EXHIBITS

9   NO.   DESCRIPTION                          IDENT.

10  D-13  Section 13 - revised exposure summary    178

11  D-15  Summary of payments 9/29/00 - 12/28/00   150

12  D-16  Summary of payments 9/20/99 - 9/18/00    157

13  D-18  Invoice copies 8/21/97 - 10/22/98        163

14  D-21  2000 list of OTC 30 day customers         35

15  P-39  4/9/98 letter                            166

16  P-40  11/24/98 Sheinman letter to Wards        104

17  P-66  Rita Hamilton trial testimony             67

18  P-75  Borrowing base certificate               172

19

20

21

22

23

24

25
```

1        THE CLERK: All rise. United States Bankruptcy

2   Court, District of Delaware, the Honorable Raymond T. Lyons

3   presiding.

4        THE COURT: Good morning. Thank you. Please be

5   seated. All right. Counsel, would you enter your

6   appearances please?

7        MR. STEINFELD: Yes, Your Honor. Good morning.

8   Joseph L. Steinfeld, Jr. appearing on behalf of plaintiff,

9   Montgomery Ward and its plan administrator. And with me,

10  I'll let her make her appearance.

11       MS. SCHEIBE: Good morning, Your Honor. Karen

12  Scheibe on behalf of plaintiff, Montgomery Ward.

13       THE COURT: Good morning.

14       MR. SCHACHTER: Good morning, Your Honor. Kenneth

15  Schachter, Silverberg, Stonehill, Goldsmith & Haber, P.C.

16  for the defendant the OTC.

17       MR. KAPLAN: And good morning, Your Honor.

18  Mitchell Kaplan for defendant, OTC.

19       THE COURT: All right. Fine. Thank you and good

20  morning. I know I've complimented counsel before in this

21  case but I want to reiterate my compliments for the fine and

22  it appears to be complete preparation that you made in

23  anticipation of this trial and the quality of the product

24  that you've submitted, the trial briefs, et cetera, the

25  organization that you've shown and also the professional

1    courtesies that you've shown to each other to arrive at a

2    very detailed stipulation, a partial stipulation of facts

3    here.  So my compliments to you again.

4         In light of the fact that both sides have filed

5    such extensive trial briefs, unless anybody feels a burning

6    desire, I don't see any need for opening statements, but

7    you're welcome to make them if you would like and since

8    we're down to a defense issue where the defense bears the

9    burden of proof, I guess, Mr. Schachter, you should go

10   first.

11        MR. SCHACHTER:  Your Honor, we're prepared to

12   proceed directly to testimony.

13        THE COURT:  All right.  Mr. Steinfeld.

14        MR. STEINFELD:  I hate to pass up an opportunity

15   to say one or two words, so I will, but I'll keep it

16   extremely brief because I agree that what we've put forward,

17   both sides have put forward in our briefs do summarize our

18   positions.  I just wanted to basically comment on what I

19   anticipate the proceeding is going to be like.  I'd like to

20   give the Court a little bit of a road map and then I suppose

21   certainly Mr. Schachter can respond.

22        This is a little bit of an unusual case, if I say

23   so myself, in the fact that we've had a consolidated

24   proceeding where a record was developed, an initial record

25   where there were three basic defendants that joined together

1    and evidence was put on before the Court almost a year ago.

2    And then we subsequently had additional discovery and

3    another trial for one of the jewelry defendants, M.

4    Fabrikant.

5         And as the Court is aware, there were things in

6    that trial that came out that the Court has now ruled are

7    going to be part of this trial, subject to the defendants

8    made objections, the Court overruled them, sustained in some

9    cases on motions in limine. So that's already before the

10   Court and we're not going to spend the time today to

11   obviously rehash that. We assume the Court will read that

12   testimony. The Court probably remembers a lot of the

13   testimony in any respect.

14        But there will be some testimony today from the

15   plaintiff's standpoint further eliciting comments,

16   principally from Randy Brown and interpreting the various

17   documents that were introduced in the Fabrikant trial

18   concerning the issue of morbidity and financial condition of

19   the debtor prior to or at the time of the terms change and

20   continuing during the preference period.

21        And then in effect what we have here is a

22   marathon. I hate to call it that, but it seems like it to

23   me. And while you thought we ran about 13.1 miles of the

24   26.2 miles, I think we're going to have to go back a few

25   miles and then go forward. And I suspect, with the

1   cooperation of both counsel, we'll try to make this as
2   quickly and expeditiously as possible and it should occur.
3   And then it will be up to the Court, of course, to read all
4   of the mountain of material that has been presented and make
5   its final decision.

6            The briefs set forth our argument and again, I
7   don't think I'll repeat it here.  I just wanted to lay that
8   predicate of what we anticipated doing.  This trial not only
9   will be concerned about the financial condition of Wards,
10  because that's an important aspect of the ordinary course
11  defense, whether it be the objective or the subjective test,
12  but it also will be concerned about interpreting the payment
13  pattern between the parties.

14           And that I think will be a lot of what the Court
15  will hear today and maybe tomorrow, is whether or not there
16  was a substantial or even reasonable deviation in the
17  payment patterns between the parties and the payment
18  practices between the parties and whether or not the
19  critical issues, I'm sure the Court is aware, is whether or
20  not a days past due approach to analyzing how the parties
21  made payments versus an invoice to pay is going to be a
22  critical issue before the Court.  And I'm going to reserve
23  basically arguing the case because that's really better for
24  closing argument.  I just wanted to lay that out as a
25  predicate.

1    And one other point, though, that I think, a
2    matter of housekeeping that the Court should be aware of, is
3    that during the industry trial there were no stipulations
4    that I'm aware of with regard to issues like solvency,
5    financial condition or anything for the most part.  It went
6    in on the theory that there was going to be a determination.
7    At least we went into that first trial under the impression
8    that we were going to discuss whether or not a term of 30
9    days was ordinary in the industry or not.

10    During that trial there were other issues that
11    were touched upon, but at the time that we went into that
12    trial, this defendant, and I suspect he'll correct me if I'm
13    wrong, but I'm pretty sure I'm right, hadn't formulated the
14    pretrial statement with respect to all of the issues,
15    including the 547b issues, b1 through 7 or 8, or whatever
16    they are.  And one of the 547b issues, which is, of course,
17    the plaintiff's case, is whether or not the debtor was
18    solvent at the time of the transfers, the insolvency.

19    And it is a rebuttable presumption, but oftentimes
20    there's evidence of solvency that rebuts the presumption and
21    it doesn't need to be a huge amount of evidence.  It has to
22    be some reasonable level of evidence, the Courts have found.
23    And we didn't know what or if they were going to provide and
24    we hired our solvency expert.  But none of that evidence
25    went before the Court in the first trial.

1    And now that we have the benefit of the Court's
2    ruling in the first trial, we have the stipulations. And
3    one of the stipulations that the defendants have agreed to
4    is that the defendant agrees that Wards was insolvent. Not
5    the rebuttable presumption, they can't rebut it, it's just
6    they stipulated to insolvency. And that I think is an
7    important overlay that the Court should consider when it
8    considers the evidence here, because the terms change that
9    occurred in this case occurred a matter of, I think it's 37
10   days prior to the stipulated insolvency of the defendant.

11   An insolvency, as I'm sure the Court is aware, in
12   the Bankruptcy Code is defined as the -- if you take the
13   liabilities of the company as stated in its financial
14   statements basically and overlay that with the assets of the
15   company, however assets evaluated at fair value, whether or
16   the not the liabilities exceed the assets. Which it is, I
17   would say it will be unrebuttable that that was the case in
18   this case not only during the preference period, but before
19   the preference period.

20   The other issue that I think the Court should
21   think about is that there's no question that every single
22   invoice and payment that was made prior to the preference
23   period was done at the 60 day terms. So even though the
24   terms change occurred 37 days prior to the preference
25   period, the effect of that terms change, unlike some of the

1    other cases where there were certainly earlier terms changes

2    that affected a pre preference period, the effect of the

3    terms change was wholly within the preference period.

4          There isn't a single invoice that the defendant

5    will be able to point to that carried a term of 30 days and

6    was paid on a term of 30 days, an accelerated payment,

7    during the historical period with regard to these standard

8    terms.  So that is a factual distinction.

9          THE COURT:  I don't follow that.  You better

10   explain that to me.

11         MR. STEINFELD:  I will.  In other words, take your

12   M. Fabrikant case as an example.  The Court heard evidence

13   of that.  The terms were changed in M. Fabrikant, I believe,

14   in June of 2000 and they were effective therefore in July of

15   2000 for shipments that were in July, August and September

16   of 2000, a three month period prior to the preference

17   period.  So the parties had begun to establish, one could

18   argue, although I argued against it, of course, begun to at

19   least establish some base line of dealings under these new

20   stated terms prior to the preference period.  I would argue,

21   and I think correctly, --

22         THE COURT:  I see what you're saying.

23         MR. STEINFELD:  Now do you understand what's I'm

24   saying?

25         THE COURT:  That there were no 30 day invoices

1    that were paid prior to the preference period.

2              MR. STEINFELD:  Correct.

3              THE COURT:  Okay.

4              MR. STEINFELD:  And that is unique in this case.

5    And the other thing that the evidence will show that is

6    unique in this case as opposed to the other cases the Court

7    has heard, is that this defendant was paid in full, had no

8    claim in the bankruptcy or chose approximately $16,000.

9    There's a stipulation as to that.  They decided not to file.

10   But when you have approximately $3 million of transfers or 2

11   plus million of transfers in the preference period and you

12   get it down to a mere 16,000 even before you reconcile,

13   because there could be credits and debits that could be

14   reconciled, effectively they were paid in full.

15             In the Fabrikant case and in other of the cases

16   that we've had, there was an acceleration and there was a

17   preference we argued, but there was at least some payment.

18   You know, they didn't leave the table wholly satisfied.

19   Whereas in this case, this is the only defendant that I have

20   seen in the cases that we have had where, and the evidence

21   will have to show why that occurred, they left the table

22   basically with all the money paid, while the rest of the

23   creditors, of course, $350 million of claims that we're

24   paying, over $2 billion of claims filed, were obviously not

25   paid at that point in time.  And I think that's significant.

1    And it's also significant, Your Honor will see,

2  that during the preference period in December and also in

3  Thanksgiving time, which is a very high credit time for the

4  jewelry industry, and the evidence is pretty much

5  indisputable about that, these defendants were getting paid

6  down significantly faster on their debt than any of the

7  other creditors and even than the other jewelry vendors they

8  were getting paid down faster.  So that by December, I think

9  it's like 10th or so, they virtually were owed no money.

10  And that to me will be, of course, an evidence of

11  abnormality.

12    With that, I'm going to wait for the evidence and

13  present it to the Court, and I appreciate your attention.

14    THE COURT:  Thank you.  All right.  Mr. Schachter,

15  are you ready to call a witness?

16    MR. SCHACHTER:  Yes, I am, Your Honor.

17    MS. SCHEIBE:  Your Honor, if I might just

18  interrupt for one moment?  We have one housekeeping matter

19  that I just wanted to address.

20    THE COURT:  Ms. Scheibe.

21    MS. SCHEIBE:  Mr. Schachter, I apologize.

22    MR. SCHACHTER:  Okay.

23    MS. SCHEIBE:  I do appreciate the Court's

24  compliments on being organized.  Unfortunately we do have --

25  we're not quite as organized as we thought that we were.  We

1   have some supplemental exhibits to add to the Court's copy

2   and the witness's copy. We've already handed it to the

3   defendant. If I might approach the bench, Your Honor?

4           THE COURT: All right.

5           MS. SCHEIBE: This is the witness's copy. I'm not

6   quite sure if you have that binder.

7           THE COURT: Well, why don't you hold that.

8           MS. SCHEIBE: Here's the Court's copy.

9           THE COURT: Okay. Let's see. I have plaintiff's

10  exhibits and defendant's exhibits. I think I only have one

11  copy here, so okay, I'll just keep this.

12          MS. SCHEIBE: That's fine. If I might just direct

13  Your Honor for a moment --

14          THE COURT: Why don't you go back to the

15  microphone so we get your voice picked up.

16          MS. SCHEIBE: Just to direct Your Honor, what

17  we're supplementing or revising, I guess, is plaintiff's

18  exhibit 36. We've changed the exhibit headings at the top

19  of the pages. They're handwritten. It was just a clerical

20  error. So it should just be replaced.

21          THE COURT: All right.

22          MS. SCHEIBE: The information hasn't changed in

23  any manner. Also plaintiff's exhibit 55C, it should be

24  appended to the end of plaintiff's 55A and B. It's just the

25  backup detail for 55. And the last thing that's in there is

1   a defendant's exhibit.  It was part of the defendant's

2   expert report. They subsequently revised that and we

3   received that on Monday.  So that really should go into the

4   defendant's binder, but I wanted to present that to the

5   Court, as well.

6            THE COURT:  All right.  Thank you.

7            MS. SCHEIBE:  I do notice that the witness's copy

8   for plaintiff is over there.  If you don't mind, if I put it

9   over there?

10            THE COURT:  That's fine.

11            MS. SCHEIBE:  Thank you.

12            THE COURT:  Mr. Schachter.

13            MR. SCHACHTER:  Thank you, Your Honor.  The

14   defense calls Yoran Sheinman.

15            THE COURT:  Mr. Sheinman.  Good morning.  Mr.

16   Sheinman, before you sit down, I'd like to administer the

17   oath to you.  There's a Bible to your left, if you would

18   place your left hand and raise your right hand.

19            DEFENSE WITNESS, YORAN SHEINMAN, SWORN

20            THE COURT:  All right.  Please have a seat.  How

21   do you spell your last name?

22            THE WITNESS:  Sheinman, S-H-E-I-N-M-A-N.

23            THE COURT:  And your first name?

24            THE WITNESS:  Y-O-R-A-N, Yoran.

25            THE COURT:  Y-O-R-A-N?

1              THE WITNESS:  Yes.

2              THE COURT:  All right.  Thank you.  All right.

3    And if you would just keep your voice up, that microphone in

4    front of you will pick up your voice and it's being recorded

5    in the computer over here.  Mr. Schachter.

6    DIRECT EXAMINATION BY MR. SCHACHTER:

7    Q    Yes.  Mr. Sheinman, where were you born and raised?

8    A    In Israel.

9    Q    And were you also educated in Israel?

10   A    Yes.

11   Q    And what was the highest level of education that you

12   attained?

13   A    I was in the Academy Air Force.  I studied as an

14   engineering regarding the air force to help in the missiles.

15   Q    And are you now a United States citizen?

16   A    Yes.

17   Q    And when did you come to the United States?

18   A    Late 70.

19   Q    And why did you come to the United States?

20   A    I liked this country.  I saw some opportunities and I

21   decide to take a chance.

22   Q    And what business are you in today?

23   A    I'm in a jewelry business.

24   Q    Okay.  And with what company?

25   A    OTC International.

1   Q    And what's your position at the company?

2   A    President.

3   Q    And how long have you been president?

4   A    Since we -- day one.

5   Q    And do you mean that you formed the company?

6   A    Yes.

7   Q    And with whom did you form the company, if anyone?

8   A    With my brother.

9   Q    And when was that?

10  A    Late 70.

11  Q    How did you get into the jewelry business?

12  A    I was in Israel at this time and I had a business, very

13  successful business there for coins, commemorative coins,

14  what was collected all around the world by collectors.  And

15  some of the customers was here in the United States.  So I

16  used to travel a lot around between -- mainly between Europe

17  and the States with this business.

18        One day in the winter, I was supposed to meet somebody

19  and he make a point of meeting at 47th Street, what is the

20  district, the jewelry district, one of places there, that he

21  was friendly with the owner of the place, and he told me to

22  wait there till he would arrive, because it was cold

23  outside.  And I wait.

24        And then I have a discussion with the owner of the

25  place and during the discussion he asked me if I know

1    anything about jewelry from Israel and I told him that I
2    have not too much knowledge about Israel, but I know one of
3    my customers from Germany is a very -- very well involved
4    with jewelry in Europe and I can ask him.  Maybe he can help
5    because I know that he was buying a lot of product in Italy.
6         So after this meeting, I just give him a call and ask
7    him if he can make me some connection and this was in the
8    winter.  Sometime in the summer, during another traveling
9    time, I found that I have a package in the U.S. Custom.  I
10   have no idea.  I went over and it was jewelry, samples of
11   jewelry.  So when I look at this, I realize that this is
12   something what connected with this telephone.  So with this
13   package this package and I went to the same guy on 47.  I
14   show him the merchandise and he was very excited, extremely.
15        And I realized that the way how he responded, it's
16   maybe very good quality.  So I took the merchandise and I
17   tried to search and to learn a little bit.  I give another
18   call to my friend in Germany.  Then he told me that he can
19   set up an appointment for me in Italy to go and to look.
20   And I make a time to be in Italy, because it was just before
21   the vacation time.
22        But in July there is a jewelry show in New York at the
23   Sheraton at this time, Sheraton at that date.  So I went to
24   see the jewelry show and in one of the places, at one of the
25   Italian exhibits, I saw some interesting merchandise.  So I

1   start to talk to the guy, the Italian guy.  And as we're

2   talking, he said to me, hold on one second.  He went to the

3   corner, he opened his attache case and he took a notebook

4   and he said, are you Mr. Sheinman?  I say, yes.  He said,

5   oh, my friend from Germany called me and he gave me your

6   name and he say, if I can locate you in the States, because

7   you are interesting for jewelry and these.  And I didn't put

8   too much attention to it, but here we are.

9   Q     And is that how you got in the jewelry business?

10  A     That's how I start just to introduce myself.  So we

11  become friends.  We went to dinner.  And then he invite me

12  immediately to Italy and it was just before the vacation.

13  And I went to Italy and I met the guy and he start to show

14  me a little bit about jewelry, explain to me.  And I pay for

15  merchandise and that's how I really start.  That's my first

16  connection to the jewelry.  Then I came back and I start to

17  show the merchandise to other people.  Everybody show very

18  much interest.  I didn't have any place.

19       I took a space in the bank, a safe deposit.  And from

20  one safe deposit it become like 10, 12.  It was starting to

21  be an operation in the bank.  And people come down to the

22  safe deposit to get merchandise.  I handled some business

23  through the bank.  The guy that was in charge of the safe

24  helped me a little bit and he was nice to me.  But one day

25  he was not there and this probably took like three, four

1    months and I realized that I have to move out from there

2    because it's getting bigger.

3           So I already arrange another place, a rented space.

4    But I remember the day. One day he was not there.  He was

5    sick or something and someone come down to the area and

6    started, who's Mr. Sheinman, who is Mr. Sheinman?  What

7    happened is somebody called to the bank to look for me, but

8    they usually called direct to the guy.  He was not there, so

9    the phone started to circle around and the manager of the

10   bank -- what you doing here?  I said, I'm sorry.  I'm in a

11   business.  And so he gave me -- we argued a little bit and

12   he gave me ten days to finish my business in the bank.  And

13   then I move and I start my company.

14              MR. STEINFELD:  Your Honor.

15              THE COURT:  What?

16              MR. STEINFELD:  I mean I find this very

17   interesting, but I just wonder how relevant the early

18   history of OTC is.  And we have a lot of witnesses here

19   today and I just wondered if we can't -- I could stipulate

20   that he started out as a small business.

21              THE COURT:  No, I understand.  I think Mr.

22   Schachter is getting to the next phase.

23              MR. SCHACHTER:  I was.

24              THE COURT:  This was just background.

25              MR. STEINFELD:  Okay.

1    BY MR. SCHACHTER:

2    Q    What types of products does OTC sell today?

3    A    We are involved with fine jewelry, what is gold,

4    diamond, silver, cameos, and even watches a little bit.

5    Q    And is that the same as your business back in 2000?

6    A    Not really.  I think the diamond came stronger after

7    2000.

8    Q    Now you use the term fine jewelry.  Have you heard the

9    term branded fine jewelry?

10   A    Yes.

11   Q    And what do you understand branded fine jewelry to be?

12   A    Branded is merchandise what created by either a

13   specific person or under a name and they sell under this

14   either slogan or name or person's name that they give to the

15   merchandise.  It's more a cover as unique.

16   Q    In 2000, the year 2000, did OTC sell branded fine

17   jewelry?

18   A    No.

19   Q    Now you mentioned -- and since 2000 is the relevant

20   period, we'll discuss that time instead of the present.  In

21   2000 what were your general duties and responsibilities at

22   the company?

23   A    I was the president of the company.

24   Q    Okay.  But as the president, what did you generally do

25   on a daily basis?

1    A     Basically I was in charge of all the operation, but I

2    focused more about developing business, the sales

3    organization and people.

4          THE COURT:  And what was the last thing, people?

5    A     People, you know, relationship with the people.

6    Q     And where was OTC located in 2000?

7    A     In Long Island City, New York.

8    Q     And did OTC employ sales people in 2000?

9    A     Yes.

10   Q     And were the sales people assigned different accounts?

11   A     Yes.

12   Q     And was Montgomery Ward one of OTC's customers in 2000?

13   A     Yes.

14   Q     And was there a salesman who was in charge of that

15   account in 2000?

16   A     Yes.

17   Q     And who was that salesman?

18   A     Michael Sheinman.

19   Q     And what is Michael Sheinman's relationship to you?

20   A     He's my nephew.

21   Q     And is that your brother's son?

22   A     Yes.

23   Q     And how long -- withdrawn.  You had mentioned in your

24   earlier testimony that you attended a trade show at the very

25   beginning, a jewelry trade show in New York.

1    A    Yes.

2    Q    In the year 2000 did you continue to attend trade

3    shows?

4    A    Yes.

5    Q    And had you done that throughout the history of your

6    being in the jewelry business?

7    A    Yes.

8    Q    And are there within this country major jewelry trade

9    shows?

10   A    Yes.

11   Q    And what are the major jewelry trade shows?

12   A    The major one is in June at Las Vegas.  Then it was in

13   Orlando in the winter.  And there's also a small one in New

14   York at the Javits Center.

15   Q    And in the year 2000 did you attend the large one in

16   Vegas in June?

17   A    Yes.

18   Q    Now when you are at these trade shows do you walk

19   around?

20   A    Yes.

21   Q    And what happens?  Do people have booths?  Do they have

22   little offices?  How is it set up?

23   A    It's set up that all the exhibitors getting space based

24   on the equation what the place can give, you know?  And each

25   one has his own space what could be between 10 feet, 20

1    feet, square feet.  It's 10 by 10 or 20 by 10, whatever it

2    is the size.  And he exhibits his merchandise there and the

3    buyers, whoever clients are coming and either looking at the

4    merchandise or purchasing, whatever it is.

5    Q    Now do you know like in the year 2000, for example, do

6    you know how many people were exhibiting at the Vegas trade

7    show?

8    A    I think it's thousands.

9    Q    And do you know, have any idea how many of them were

10   selling jewelry products similar to what OTC offers?

11   A    Many, many.

12   Q    Would it be hundreds?

13   A    Some of the merchandise maybe hundreds of people

14   selling the same.  Some of the merchandise maybe less.

15   Usually we're trying to if you find something or discover

16   some new merchandise, you're trying to keep it a little bit

17   unique.  But this industry, when something is good and is

18   generic and it's not anything. In short time it could be all

19   over.

20   Q    Now you said in 2000 Montgomery Ward was one of your

21   customers.  How long had it been a customer of your company?

22   A    I would say since I think middle 80, between middle and

23   late 80.

24   Q    In the year 2000 how would you rank Montgomery Ward if

25   you were to list your customers?  Were they in the top 10 or

1   in the top 5 or in the lower 10?

2   A    I would say in the middle of the top 10.  I don't know

3   if they were 4, 5 or 6, but in the middle of the top 10.

4   Q    At any time during the entire time Montgomery Ward was

5   a customer of OTC did you ever believe that you were more

6   important to them than they were to you?

7            MR. STEINFELD:  Objection, leading.

8            THE COURT:  Sustained.

9            THE WITNESS:  Can I answer?

10           THE COURT:  No.

11           MR. SCHACHTER:  No.

12           THE COURT:  The next question.

13  BY MR. SCHACHTER:

14  Q    In the jewelry show at 2000 did you personally meet

15  with anyone from Montgomery Ward?  In Vegas I'm talking

16  about.

17  A    I think yes.

18  Q    And who do you recall meeting with?

19  A    It was a Roger Goddu and I'm not sure if he came -- I

20  think he came with a Lou Copuali (phonetic) and the buyers

21  also, but the buyers came probably separate.

22  Q    And what role in --

23           THE COURT:  I'm sorry.  The name of the second

24  person?

25           THE WITNESS:  Lou Copuali.

1   BY MR. SCHACHTER:

2   Q    When you attended the jewelry show in June of 2000 in

3   Las Vegas what was your role?  What did you do at the

4   jewelry show?

5   A    Usually you prepare and you put all the jewelry to be

6   exposed and when the buyers are coming or whether we have an

7   appointment with them regarding to see the merchandise, to

8   sit and to go over the merchandise and to either to select

9   or to work on the programs, on the future programs.  Jewelry

10  show is to show and taking all the business, starting the

11  purchasing for the business for the fall, Christmas, and

12  even you're going to the spring the year after that.  In

13  this case, if it's 2000, spring 2001.

14  Q    And you personally were at the jewelry show in Vegas in

15  2000, what did you generally do at the show?

16  A    I attend to some meetings, but I'm basically there to

17  represent also the company to be there, because usually when

18  you're coming to a show, an important show like this, your

19  customers are also expecting to see the people, you know,

20  behind the company, the president, whoever it is.  And these

21  are important issues to be there and deal at the place with

22  some customers.  I was involved.  Otherwise the salespeople

23  are dealing with the customer.

24  Q    So would it be fair to say the salespeople were doing

25  the presentations and you were there as showing that you're

1    the owner of the company?

2    A    It's not that I'm showing, you know.  They know me,

3    that I'm the owner, but I'm there to support, to help, if

4    there is any issue that is beyond just the regular business,

5    if it's speciality items, if it's an advertising issue, if

6    it's a supporting, if it's -- sometimes you need the

7    merchandise faster and we don't know if we can make it.

8    It's many issues what could be that I'm trying to support

9    and to be involved with it if they need me.

10   Q    Now you mentioned that you met Bob Goddu.  Had you ever

11   met Mr. Goddu before that?

12              MR. STEINFELD:  Roger Goddu.

13   Q    Roger Goddu, I'm sorry.  Roger Goddu.

14   A    Yeah, I met him before in another show I think, another

15   Vegas show.

16   Q    And in that Vegas show, at least the one in 2000, did

17   you have an appointment to meet with him or did he just show

18   up?

19   A    No, we didn't have appointment.  Usually this kind of a

20   meeting or whatever you call this, is more courtesy.  When

21   he's coming he's coming to show that Montgomery is inside

22   and to talk, to show the vendors that they're behind

23   jewelry, to support the jewelry, but he's not -- he's

24   talking a little bit about the business, how good it is, how

25   we want to make it bigger and how the future is good.  At

1   this point, I remember that he mentioned that they're
2   opening new stores and they're doing special things to make
3   the business better and going.
4   Q    Do you recall sitting here today what you and Mr. Goddu
5   actually said to each other back in that Vegas show in 2000?
6   A    No.
7   Q    Do you remember in sum and substance, which means
8   generally what you said to each other?
9   A    It's just -- it's for courtesy and it's very short
10  also.  He didn't come to a meeting.  I would say that
11  probably he was in the booths no more than 5, 10 minutes
12  probably.
13  Q    Now during the year 2000 do you recall receiving any
14  letters from him?
15  A    Yeah, we used to receive like a newsletter,
16  confidential, that how the situation in Montgomery, all the
17  improvement, all the future what they're looking for and a
18  little bit financial information.
19  Q    And when you would read -- did you receive more than
20  one letter during 2000 from him?
21  A    Yes.
22  Q    And when you would read the letters, what was your
23  opinion of what he was trying to convey to you?
24  A    Basically indicate that Montgomery is doing better and
25  better and they are really on the way to get out from the

 1    bankruptcy and we were very happy with that.

 2    Q    Now in front of you you have a book to your left.  Do

 3    you see that?

 4    A    Yes.

 5    Q    And I'd like you to flip to -- that's defendant's

 6    exhibit 29.  Do you see that's there?  That's the one.

 7    A    Yes.

 8    Q    If you go to the tab that says 29 and you open it.

 9    A    To what, 29?

10    Q    The other book.  I'm sorry.  The loose-leaf.

11    A    This one?

12    Q    The loose-leaf.  I meant plaintiff's 29.

13    A    Which one?

14    Q    That one.  I apologize.

15              THE COURT:  And Mr. Sheinman.

16              THE WITNESS:  Yes.

17              THE COURT:  Why don't you move that microphone

18    away from you so that you don't bang it with the book as

19    you're flipping the pages.

20              THE WITNESS:  Okay.

21              THE COURT:  Just bend it back a little bit like

22    this, okay?

23              THE WITNESS:  Thank you.

24              THE COURT:  Okay.

25    BY MR. SCHACHTER:

1   Q      Just flip to the tab that has 29, exhibit 29.

2   A      Okay.

3   Q      And could you read that to yourself and tell me when

4   you're finished?

5              MR. STEINFELD: Your Honor, may I request a

6   stipulation with counsel that this letter was never produced

7   or acknowledgement to this letter was never produced by the

8   defendant to us. We asked for copies of letters that they

9   had in their possession. Just so the record is clear, I

10  just want it stipulated, although we have this as one of our

11  exhibits, it was not a document that they ever had in their

12  possession and they gave to us. Is that okay?

13             MR. SCHACHTER: A stipulation that we didn't

14  produce it, yes.

15             MR. STEINFELD: And that when we asked for all of

16  the vendor letters and other types of correspondence, you

17  didn't have this letter at the time we asked for it.

18             MR. SCHACHTER: Yeah, I think the only one vendor

19  letter we had was December of 1999, which is -- I'll tell

20  you what it's --

21             MR. STEINFELD: Well, why don't we start with this

22  one and rather not argue, unless you're going to use that

23  one, because I just want it clear for the record.

24             THE COURT: A stipulation that P-29 was not

25  produced in response to discovery by OTC.

1              MR. STEINFELD:  Our discovery by OTC, the

2     plaintiff's discovery.

3              THE COURT:  It was not produced.

4              MR. STEINFELD:  That's all I'm asking.

5              THE COURT:  Right.  Not produced by OTC in

6     response to plaintiff's --

7              MR. STEINFELD:  If there are any other ones, we

8     can talk about them then.

9              THE COURT:  All right.

10    BY MR. SCHACHTER:

11    Q    Do you recall ever receiving this specific letter?

12    A    I remember that I received, but to say that I remember

13    exactly this letter, I cannot say it.

14    Q    Were these the types of letters that you would receive

15    from Mr. Goddu?

16    A    Yes.

17    Q    And I'd now like to ask you to turn in the same book to

18    plaintiff's exhibit 23.

19              MR. SCHACHTER:  We can stipulate this time, Your

20    Honor, I'm sure, that this is one of the letters that

21    defendant did produce.

22              MR. STEINFELD:  All right.  Let me just see on

23    that.  Unfortunately, Your Honor, we can't stipulate to that

24    because we have entire --

25              THE COURT:  Well, we need to talk about it then.

1    All we need to say that this is the exhibit.  You would ask

2    for a stipulation that P-29 hadn't been produced.

3              MR. STEINFELD:  Right.

4              THE COURT:  There's no reason to stipulate

5    anything.  All right?  We have an exhibit that the --

6              MR. STEINFELD:  It depends on what his questioning

7    is then and I'll reserve my right to object, if necessary.

8              THE COURT:  Right.

9              MR. STEINFELD:  Okay.  Thank you, Your Honor.

10   BY MR. SCHACHTER:

11   Q    Why don't we stay with P-29 for a moment.

12             THE COURT:  Back to P-29?

13   Q    Yeah, go back to P-29.

14   A    Okay.

15   Q    Having read now P-29, what do you understand it to mean

16   to you?

17   A    That the performance is very good and the sales are up,

18   the inventory down, and they are heading to the right

19   direction.  They're getting more money in cash, additional

20   $100 million, and they have availability for more money and

21   they cannot be better.  It means it looks very good.

22   Q    Did you ever receive any communication from Montgomery

23   Ward during the year 2000 in which they were claiming they

24   weren't doing well?

25   A    No.

1    Q    Besides these letters from Mr. Goddu that you would
2    periodically receive, did Montgomery Ward ever supply you
3    with their financial information?
4    A    No.
5    Q    Did anyone else ever supply you with their financial
6    information?
7    A    No.
8    Q    Did you ever attend any general vendor meetings with
9    other vendors of Montgomery Ward where they discussed their
10   finances?
11   A    No.
12   Q    Were you ever asked to sign a confidentiality agreement
13   so that you could obtain financial information from
14   Montgomery Ward?
15   A    No.
16   Q    Did you ever ask Montgomery Ward for financial
17   information at any time during the year 2000?
18   A    No.
19   Q    Did you have any information that you knew of which
20   made you believe that Montgomery Ward was in financial
21   trouble during the year 2000?
22   A    No.
23            MR. STEINFELD:  I believe that's a leading
24   question.  Objection.
25            THE COURT:  Overruled.

1    BY MR. SCHACHTER:

2    A    No.

3    Q    During the year 2000 did OTC have financing with banks?

4    A    Yes.

5    Q    And what type of financing did OTC have with banks in

6    the year 2000?

7    A    It's receivable financing.  When we ship the

8    merchandise, create the invoice, the bank finance out of the

9    invoice, anticipate money against this invoice.

10   Q    And why did OTC have this type of financing in year

11   2000?

12   A    Because it's the only way how we can support our

13   supplier because when we get an order from the customer we

14   need time for the production, the manufacturing of the

15   merchandise, and then we need time to get the merchandise,

16   to take the merchandise bag, a preparation for shipping.

17   And all this could be up to a month and sometimes more.  It

18   depends what type of merchandise it is.  And by this time,

19   before we're shipping, we already need to pay the supplier.

20   Q    During the year 2000 what type of customers did OTC

21   sell its jewelry to?

22   A    We almost sell across the board.  We sold mainly

23   department store, electronic.

24   Q    I didn't hear.  I'm sorry.

25   A    Electronic channels.  That means QVC, Home Shopping,

1   Shop NBC, department stores, chain stores and even
2   individual stores.
3   Q    In 2000 what were OTC's typical credit terms with its
4   customers?
5   A    It was, I would say, 30, 60 -- 30 days, 60 days, 90
6   days.  That's it basically.
7   Q    During the year 2000, and I'm excluding Montgomery
8   Ward, so don't tell me anything about Montgomery Ward.  But
9   during the year 2000, did OTC have 30 days terms with any of
10  its other customers?
11  A    Yes.
12  Q    And who were some of the customers -- did it have those
13  type of terms with any of its larger customers?
14  A    Yes.
15  Q    And which of its larger customers do you recall that
16  OTC had 30 day terms with in 2000?
17  A    Home Shopping -- no Home Shopping.  Shop NBC was a
18  large customer.  It was 30 days.  Kohls was 30 days.  And I
19  think Home Shopping also.  That's what I recall now.
20  Q    I'd like you to turn if you would to defendant's
21  exhibit 21.
22          THE COURT:  Now we're in the -- we're not in the
23  loose-leaf?
24          MR. SCHACHTER:  No, we're in the bound book, Your
25  Honor.

1          THE COURT:  Mr. Sheinman.

2          MR. SCHACHTER:  Mr. Sheinman, I'm sorry.  We're in

3     the bound book.

4          THE COURT:  Change books.

5          MR. SCHACHTER:  Switch books for a minute.

6          MR. STEINFELD:  Your Honor, if I can interpose an

7     objection at this point in time.  I'm not understanding

8     where we're going with this line of questioning.  It sounds

9     more like we're getting into industry evidence, which was

10    already presented to the Court and would be cumulative.

11         THE COURT:  Unfortunately there's going to be some

12    overlap and I know it's going to happen on your case, as

13    well.

14         MR. STEINFELD:  I agree, Your Honor.  I just

15    wanted you to be aware that that's my concern.

16         THE COURT:  All right.

17         MR. SCHACHTER:  I'm certainly going to do my best

18    not to try to retry what we've already tried.

19         THE COURT:  I forget when we started the industry

20    trial who was in favor of talking about change of terms at

21    that time and who said it was more appropriate in the

22    subjective test.

23         MR. SCHACHTER:  Well, I've been told that the

24    plaintiff was more in favor, yes.

25         THE COURT:  And the defendants wanted to bring it

 1    up here.

 2              MR. SCHACHTER: Yes.

 3              THE COURT: And so it's difficult to figure out.

 4    I think it applies really in both cases.

 5              MR. STEINFELD: Well, I would agree with that,

 6    Your Honor.

 7              THE COURT: Yes. Okay. All right. We're looking

 8    at D-21. Mr. Schachter.

 9    BY MR. SCHACHTER:

10    Q    Mr. Sheinman, does that independently refresh your

11    recollection as to any other customers of yours in which you

12    had 30 day terms with in 2000?

13    A    Yes, I see also a Fingerhut, a corporation called what

14    I said, a Shop at Home, and Shop NBC.

15    Q    Jumping back for a moment to that Vegas show in 2000

16    that you attended, did Montgomery Ward place any orders for

17    jewelry at that show?

18    A    No.

19    Q    And at that show was there any particular OTC employee

20    who worked with the Montgomery Ward buyer?

21    A    Yes.

22    Q    And who was that?

23    A    Michael Sheinman.

24    Q    Besides meeting customers at jewelry shows, were there

25    other times that you personally would meet with customers?

1   A    Yes.

2   Q    And did you, besides meeting with Wards at jewelry

3   shows, did you ever meet with them outside of the jewelry

4   shows?

5   A    Yes.

6   Q    And where would those -- and during the year 2000 did

7   you also meet with Wards besides at jewelry show?

8   A    Yes.

9   Q    And where -- and did you ever meet with them after the

10  June jewelry show did you ever meet with Wards?

11  A    Yes.

12  Q    And where did that meeting take place?

13  A    At Montgomery Ward's headquarters in Chicago.

14  Q    And had you ever met with them prior to that meeting at

15  their headquarters?

16  A    Yes.

17  Q    And how often would you in a year typically go to

18  Montgomery Ward's offices to meet with them?

19  A    Probably twice a year, I would say.

20  Q    Now in your business is there any particular season

21  that's more important than others?

22  A    Yes.

23  Q    And what season is the most important to you?

24  A    The most important is Christmas.

25  Q    And when you say Christmas season, what period of time

1    are you referring to?

2    A    The season starts -- it depends which customer, but I

3    would say that around September when they're asking for

4    merchandise, sometimes even earlier.

5    Q    I'm now jumping back to the meeting that you attended

6    at Montgomery Ward's offices after the June Vegas show.  Do

7    you recall when that meeting was?

8    A    In the June Vegas show?

9    Q    No, after the June Vegas show you said you went to a

10   meeting at Montgomery Ward's offices.

11   A    Yes.

12   Q    So I'm asking you do you recall when that was?

13   A    Yes.

14   Q    When was that?

15   A    It was late July.

16   Q    And did --

17   A    Maybe early August.

18   Q    I'm sorry.

19   A    No, I say late July.  It could be early August, but

20   around this period.

21   Q    Besides yourself, did anyone else from OTC go to

22   Montgomery Ward's offices for that meeting?

23   A    Besides me?

24   Q    Yes.

25   A    Yeah, Michael Sheinman.

1   Q    And what was your and Michael Sheinman's purpose in
2   visiting Montgomery Ward's offices at that time?
3   A    Basically it was an important meeting because after the
4   Vegas show they see their business during this year show
5   very good response and they was very excited with the silver
6   business, the growing silver business for them.  So during
7   the Vegas show, Michael talked with their buyers and whoever
8   came to the show and they looked through the merchandise and
9   they decide that we'll have a meeting shortly after, as
10  close to the Vegas show as much as we can, to prepare all
11  the merchandise for the fall, Christmas and 2001, spring,
12  2001.
13  Q    Before you went to that meeting did you and your nephew
14  have any discussion concerning Ward's finances?
15  A    No.
16  Q    Did you and your nephew have any discussion regarding
17  credit terms for Wards?
18  A    No.
19  Q    In your mind did you plan on discussing credit terms
20  with Wards before you went to the meeting?
21           MR. STEINFELD:  Objection.  That's definitely a
22  leading question as far as asking what his mind was.  He can
23  ask him what he thought, whether he had any thought.
24           THE COURT:  But he has to ask him what he thought
25  about a particular subject.  He can't just say, well, what

1    were you thinking about on July 27th, 2000.

2            MR. STEINFELD:  Well, he already testified he

3    didn't have any discussions.  Now he's asking for his

4    thought process?

5            THE COURT:  Right.  I'm going to overrule the

6    objection.  The question was, Mr. Sheinman, when you were on

7    your way to the meeting with Montgomery Ward did you think

8    about the credit terms between OTC and Montgomery Ward?

9            THE WITNESS:  No.

10   BY MR. SCHACHTER:

11   Q    Throughout the entire time --

12           THE COURT:  Actually the question was did you plan

13   on discussing that?

14           MR. SCHACHTER:  Yes.

15   BY MR. SCHACHTER:

16   Q    Did you plan on discussing it?

17   A    No.

18   Q    During the entire time that Montgomery Ward was a

19   customer of OTC's do you recall a single instance in which

20   OTC refused to accept a Montgomery Ward order?

21   A    No.

22   Q    Can you recall a single time where OTC refused to send

23   a shipment to Montgomery Ward?

24   A    No.

25   Q    When you first arrived at the meeting, and again I'm

1   talking about the meeting in either late July or early

2   August of 2000 at Montgomery Ward's offices, when you first

3   entered the meeting do you recall who from Montgomery Ward

4   was there?

5   A    It was a buyer, Rita, Rita Hamilton.

6              THE COURT:  Rita Hamilton?

7              THE WITNESS:  Yeah.  Rita Hamilton.

8   BY MR. SCHACHTER:

9   A    Her assistant, I think one or two planners and

10  advertising person, a lady for the advertising.

11  Q    Did you and Michael bring anything with you to that

12  meeting?

13  A    Yes.

14  Q    And what did you bring with you?

15  A    We brought the merchandise, what was supposed to take

16  place and to present what Michael worked on part of this

17  with a buyer at the Vegas show, some additional merchandise,

18  mainly it was silver merchandise and also a little bit of

19  gold.

20  Q    To your company in your internal costs is there a

21  difference to you as to -- excuse me.  Is there a difference

22  to OTC in costs to itself if it's selling gold as opposed to

23  silver?

24  A    There is a difference.  The first is a difference of

25  the price.

1   Q    No, I'm talking about besides the price.

2   A    The silver, the nature of the silver is that you're

3   dealing with a relatively sometimes small items, what is a

4   very low cost, very intensive labor and sometimes there's a

5   lot of units.  I mean sometimes there is.  Mainly it's more

6   units than you sell in gold.

7   Q    And how does the fact that it's more units than gold --

8   does that affect the cost to OTC?

9   A    If you have more units you need more population.  If

10  you need more population, you need more help and that's part

11  of it, yes.

12  Q    Now during the meeting, again we're sticking with this

13  meeting in July, August of 2000, when you were presenting

14  the jewelry, for what sales periods were you showing Wards

15  jewelry for?  For delivery when?

16  A    In this meeting?

17  Q    Yes.

18  A    Usually it's starting September.  If you're dealing in

19  July, they would like to have merchandise sometimes the

20  earliest as you can.  It depends on how the structure is

21  between the buyer and the salesperson.  Because if they want

22  to do something in August, and it's available, then it's

23  August.  But usually this take place for the fall, Christmas

24  and all the product for spring, Valentine Day and Mother's

25  Day.

1    Q    When you say spring, Valentine Day and Mother's Day, do

2    you mean of the following year?

3    A    Yes.

4    Q    So that at the meeting you're having in July you're

5    already discussing purchasing for the following year?

6    A    Yes.

7    Q    And why do you discuss purchasing for the following

8    year in July and August?

9    A    Because everybody wants to be prepared.  It means they

10   want -- we need to know what they're looking for.  Usually

11   during the season it's more difficult to work on the spring

12   because sometimes around September, October, November,

13   everybody is busy, including the manufacturer to finish the

14   product for the Christmas.  So basically they're starting to

15   produce the merchandise for the spring sometimes around

16   December, January, because you have to -- in January you

17   have to ship the Valentine Day already.

18   Q    And when you attended this meeting in July or August of

19   2000 were you intending to also make deliveries to Ward in

20   January of 2001?

21   A    Yes.

22   Q    And were you intending to also make deliveries in

23   spring of 2001?

24   A    Yes.

25   Q    During the course of the meeting did anyone else from

1    Montgomery Ward join the meeting?

2    A    Yes.

3    Q    Who else joined the meeting?

4    A    At some point -- I don't know.  Sometimes in the middle

5    of the meeting a Bob Baird.

6    Q    Had you ever met Bob Baird before?

7    A    No.

8    Q    Do you know how he came to join the meeting?

9    A    Yes.

10   Q    And how did he come to join the meeting?

11   A    He was at this time in charge of the jewelry division

12   of Montgomery Ward.  He was the top executive of that.  And

13   I don't know -- I don't recall how he came.  I think Rita

14   mentioned that's he interested to meet us because everybody

15   was excited with the silver business.  And he showed up very

16   casual and we explained to him, Rita explained to him about,

17   a little bit about the merchandise because he has no -- he

18   didn't have a knowledge about jewelry so much.  And

19   basically he was showing very much interest how we can take

20   this business and grow it and make it bigger and better.

21   Q    And when he -- do you recall -- I know you don't recall

22   his -- you don't recall his exact words, do you?

23   A    No.

24   Q    So generally do you recall what in sum and substance he

25   said to you and you said to him at the meeting?

1      MR. STEINFELD: I believe it's already been

2  answered with regard to -- or with regard to what, I

3  suppose.   It's open-ended.

4      THE COURT: Overruled.

5  BY MR. SCHACHTER:

6  A    As we're talking about that, he asked if we can do

7  something also to boost the season and to make more.  And I

8  said to him that it's a little bit difficult because of the

9  time and the pressure, because we're already planning for a

10  big season as is for Montgomery Ward.  And then we have an

11  open conversation, it was very casual, and he came with the

12  idea.

13      He said, look, if we change the terms, it can help?

14  And I look at him and I say, I think it definitely can help.

15  And he said I can change your terms and he asked what the

16  terms were and we told him it's 60 days.  He said, what

17  about if we change this to 30 days and you participate 1

18  percent.  It means I will charge you for that 1 percent.

19  And I said it's good because it can help our cash flow and

20  we can speed up probably more merchandise to put in the

21  pipeline to the manufacturer.

22  Q    At the time that you were meeting in -- by the way, did

23  OTC also meet with its other large vendors prior to the

24  Christmas season -- excuse me, other large customers prior

25  to the Christmas season for 2000?

1   A    No.

2   Q    And did OTC, for example, meet with Kohls, did you plan

3   for the Christmas 2000 --

4   A    Oh, I'm sorry.  I missed that question.  Can you say

5   that again?

6   Q    For the year, the Christmas 2000 season, besides

7   Montgomery Ward, did OTC also meet with its other large

8   customers?

9   A    Oh, yeah, sure.

10  Q    And was it for the same purpose that you would meet

11  with Montgomery Ward, to plan the sales?

12  A    Yes, yes.

13  Q    And at the time you were meeting with Montgomery Ward

14  had you already or were you planning to have similar

15  meetings with your other vendors -- other suppliers -- other

16  customers?  I'll start again.

17  A    Okay.

18  Q    At the jewelry show in Vegas, had you met with your

19  other large customers?

20  A    Yes.

21  Q    And did you get a sense from your other large customers

22  what they were planning to do for the Christmas of 2000?

23  A    Yes.

24  Q    And would you use that information to plan what you

25  would need as a company to meet your customers' needs?

1    A    Yes.

2    Q    Do you know what the word negotiation means?

3    A    Yes.

4    Q    Was there any negotiation over the 30 day terms between

5    OTC and Wards?

6    A    No.

7    Q    Was there any discussion or offer to give OTC 30 day

8    terms that wasn't connected to an increase in business?

9    A    No.

10   Q    Did you know what the terms were that Wards was buying

11   from its other customers?

12   A    Say that again.

13   Q    Did you know what terms your other customers were

14   selling to Wards on?

15   A    No.

16   Q    Did you ever discuss with any other customers what

17   terms they had?

18          MR. STEINFELD:  Objection.  How could their

19   customers sell to Wards?

20   BY MR. SCHACHTER:

21   Q    I mean the other vendors --

22          THE COURT:  Let's start over again.  Hold on, hold

23   on, hold on.

24          MR. SCHACHTER:  I withdraw the question.

25          MR. STEINFELD:  Okay.

1          THE COURT: Start over again. You're talking

2    about competitors.

3    BY MR. SCHACHTER:

4    Q    Your competitors, did you know what terms your

5    competitors sold to Wards on?

6    A    No.

7    Q    Did you ever discuss with any of your competitors the

8    terms they sold to Wards on?

9    A    No.

10   Q    Did anyone ever tell you what your competitors' terms

11   with Wards were?

12   A    No.

13   Q    During this July August meeting did you ever say to

14   anyone, if you don't change terms we won't sell jewelry to

15   you?

16   A    No.

17   Q    Did you make any demands of Wards at all at that

18   meeting?

19   A    No.

20   Q    Did you ever demand that they make payments to you of

21   old money they may have owed you?

22   A    No.

23   Q    Was there any discussion of whether -- during that

24   meeting was there any discussion as of that moment in time

25   that Wards owed you money or didn't owe you money?

1    A    No.

2    Q    As a result of that meeting did OTC take any steps to

3    acquire inventory for sale to Wards?  Withdrawn.  Prior to

4    December of 2000 did OTC take any steps to acquire inventory

5    that it hoped to sell to Wards in 2001?

6    A    Say that again please.

7    Q    During the year between July 2000 and December of 2000,

8    when Wards filed, had OTC begun to get inventory that it

9    hoped to sell to Wards in the year 2001?

10   A    Yes.

11   Q    During the month of -- withdrawn.  There came a time

12   that you learned that Wards filed for bankruptcy?

13   A    Yes.

14   Q    So now I want to use the time period from your July

15   meeting to the time that you found out that Wards had

16   actually filed.  In that time period, to your knowledge, did

17   OTC ever demand a payment from Wards?

18   A    No.

19   Q    Did OTC ever refuse an order from Wards?

20   A    No.

21   Q    Did OTC ever refuse to ship merchandise to Wards?

22   A    No.

23   Q    Did OTC ever request that Wards give any additional

24   security?

25   A    No.

1   Q    Did you ever discuss with Wards credit insurance?

2   A    No.

3   Q    Did you ever seek to get credit insurance for your

4   sales to Wards?

5   A    No.

6   Q    At the time that Wards filed its bankruptcy, do you

7   know approximately how much inventory OTC was holding which

8   it had hoped to sell to Wards in 2001?

9   A    I would say at least half a million dollars.

10  Q    And what happened to that merchandise?

11  A    We tried to liquidate this after we know that they went

12  into bankruptcy.  And some of the merchandise we still have

13  now.

14  Q    Well, why weren't you able to simply, if it's

15  unbranded fine jewelry, why couldn't you just sell it to

16  Kohls, for example?

17  A    Because it was a specific program, what we did for

18  Montgomery.  If it was an earring project or some necklaces

19  or some kind of program that they did some advertising

20  regarding to it.  Some of them we were able to liquidate,

21  maybe by the cost, even if we took a little bit loss or it

22  could be a small profit.  But a big part of it we still

23  carry now.

24  Q    In September of 2000 had you learned that Montgomery

25  Wards was in financial difficulty, would you have allowed

1    the company to ship them on 30 day terms?

2    A    No.

3    Q    If in this Christmas season shipping period of 2000, at

4    any time during that period had you learned that Wards was

5    in financial difficulty, would you have allowed your company

6    to continue to ship to them on 30 day terms?

7    A    No.

8    Q    Do you know how Wards would pay OTC for the jewelry you

9    delivered to it?

10   A    I'm assuming by checks.

11   Q    Were you involved in that?

12   A    No.

13   Q    During the year 2000 did you ever become involved in

14   it?

15   A    Not that I know.

16   Q    As president of the company during the year 2000 did

17   you ever discuss with anyone else payments that Wards had to

18   make to OTC?

19   A    Yeah, I remember that after the meeting, you know, I

20   just came to Lee Rothline (phonetic) and I told him about

21   the change of the terms based on what Bob Baird indicated to

22   us and I let him know that the terms is changed and we give

23   1 percent discount and we'll get this in 30 days to help a

24   little bit the cash flow.

25   Q    Did you ever have any discussions during 2000 with your

1  bank concerning Wards?

2  A    No.

3  Q    Do you know did anyone at OTC ever tell you that they

4  had discussions with your bank about Wards?

5  A    No.

6  Q    Did you ever instruct anyone at your company to do

7  anything to try to collect money from Wards in the year

8  2000?

9  A    No.

10  Q    Do you know of any efforts that OTC made to collect

11  money from Wards during 2000 other than the ordinary

12  payments that came in?

13  A    No.

14  Q    Do you know whether or not Wards actually increased its

15  business with OTC for Christmas 2000?

16  A    I don't know, but maybe it is, but I don't know.

17  Q    During the Christmas season of 2000 did you consider

18  Wards to be an important customer of your companies?

19  A    Yes.

20        MR. SCHACHTER:  One second, Your Honor.

21  BY MR. SCHACHTER:

22  Q    At any time that you did business with Montgomery Ward

23  did you ever recall OTC having a credit limit with

24  Montgomery Ward?

25  A    No.

1    Q    Do you recall at any time in the year 2000 while you
2    did business with Montgomery Ward asking Montgomery Ward for
3    a payment because they had reached some type of credit
4    limit?
5    A    No.
6            MR. SCHACHTER:  I have no further questions.
7            MR. STEINFELD:  Your Honor, my cross will probably
8    take a little while, not as long as direct, I'm sure.  But
9    I'd like to take a break if that's okay and give the witness
10   a break.
11           THE COURT:  All right.  Ten minutes?
12           MR. STEINFELD:  Yes, that's fine.
13           THE COURT:  It's about 11:27 by my watch.  I can't
14   see the clock in the back.  Come back about 11:40.
15           MR. STEINFELD:  Okay.
16               (Court stands in recess)
17               (Court resumes in session)
18           THE CLERK:  All rise.
19           THE COURT:  Thank you.  Please be seated.  Mr.
20   Sheinman.  Mr. Steinfeld.
21           MR. STEINFELD:  Thank you, Your Honor.
22   CROSS EXAMINATION BY MR. STEINFELD:
23   Q    Good morning, Mr. Sheinman.  How are you?
24   A    Good morning.  Thank you.
25   Q    As you know, I'm counsel for the plaintiff and I've got

1    a few questions to ask you.  I'd like to start with your

2    statement concerning unsold product that you had inventoried

3    for Wards but didn't deliver to Wards.  Do you remember that

4    part of your testimony?

5    A    Yes.

6    Q    Okay.  Now first of all, why didn't you deliver that

7    product in December, if you know, of 2000?

8    A    When the delivery took place is based on the purchase

9    from the buyer.  We are not allowed to deliver on our own

10   because we have the merchandise there.

11   Q    So is it your testimony that Wards didn't actually

12   issue purchase orders for those particular goods?

13   A    Yes.

14   Q    Okay.  Now you've said that -- and do you have any idea

15   why Wards in December didn't issue purchase orders for those

16   goods?

17   A    No.

18   Q    Did that surprise you at the time?

19   A    No.

20   Q    Why didn't it surprise you?

21   A    Because they like to clean the inventory for the

22   Christmas and then in January they usually put the purchase

23   order for February, March and April.

24   Q    So to the best of your understanding, this merchandise

25   was not part of the Christmas buy?

1   A    Part of it was part of the Christmas buy because when

2   we have a program with them, we have to keep also on hand

3   merchandise to support the sales.

4   Q    Well, were you surprised as president of the company

5   that in the end of November, which is when I assume the

6   latest they would have had to put an order for this product

7   in, that they didn't?

8   A    No.

9   Q    Even though it was for Christmas?

10  A    It was not for Christmas.  Whatever the purchase we

11  deliver.  But usually the month of December is a very slow

12  month for ordering unless there is an emergency.  The nature

13  of this industry, I think, December you don't make delivery.

14  Q    So indeed what might have happened was that Wards

15  simply didn't order as much product in 2000 as you might

16  have anticipated that they would have.  Is that what

17  happened, in other words?

18  A    No, no.  Can you ask you again?

19  Q    I will repeat the question.  I'll rephrase it.  Isn't

20  it true, in fact, that Wards did not ramp up its purchases

21  in Christmas of 2000 versus the previous year?

22  A    You make an assumption that I don't understand.  The

23  way you ask it is like if 2000 in December they didn't make

24  a delivery, they didn't ask for merchandise?

25  Q    All right.  I'll try to rephrase the question.

1    A    Okay.

2    Q    I believe you testified that you thought or you were

3    told that Wards was interested in increasing its jewelry

4    business with you.  Correct?

5    A    Correct, yes.

6    Q    However, in hindsight, do you agree that that did not

7    occur?

8    A    We delivered everything what they ask for.

9    Q    That's not the question I asked though.  I asked did

10   they ask for less than you anticipated they would ask for?

11   A    Not as I -- when it was -- I didn't see that, no.  I

12   don't agree with that.

13   Q    Were you in charge of tracking the shipments from

14   Wards?

15   A    No.

16   Q    So that you don't have actual knowledge, do you?

17   You're not testifying from actual knowledge as to the level

18   of shipments that Wards was requesting from your company.

19   A    No.

20   Q    And this, the half a million dollar figure, that's just

21   a guess on your part, isn't it?

22   A    Yes.

23   Q    And you have no documents that would support this half

24   a million dollar of unsold product, do you?

25   A    It would be very difficult to document this now.  It's

1   a rough estimate.   It's an estimate that could be even

2   higher than this.

3   Q    Okay.   And when did you make this estimate?   Did you

4   make it in the year 2000?

5   A    No, I didn't make this in the year 2000.   But as we did

6   the check later on in the years, the inventory, we realized

7   that a lot of the orders, a lot of the merchandise what's

8   supposed to go to Montgomery Ward at this time, we still

9   have in inventory.   That's how I estimate this.

10  Q    And as we sit here today, you have no idea how much of

11  that is still in inventory.

12  A    Not really.

13  Q    And you don't know whether you've recouped through

14  profitable sales of the remaining inventory enough to cover

15  the cost of the entire inventory.

16  A    I know that we didn't.

17  Q    How do you know that?

18  A    Because when it comes to this issue, you're trying to

19  sell the inventory as quick as you can.   And at this point

20  you're doing this for cost and less.

21  Q    I think you testified in some cases cost and more.

22  There was some profit.

23  A    It could be, but the majority I would say it's cost and

24  less.   And whatever we have today, we're still willing to

25  sell this for less than cost.

1   Q    Now did your company file a claim in the Montgomery

2   Ward bankruptcy, this bankruptcy?

3   A    I don't know.

4   Q    Who would know?

5   A    The lawyer.

6   Q    Excuse me?

7   A    Our lawyer probably.

8   Q    Your lawyer would know.  Okay.  Are you aware of

9   whether OTC was owed any money by Wards when it filed

10  bankruptcy?

11  A    I believe so.

12  Q    And how much do you believe they were owed?

13  A    A small amount.

14  Q    About $16,000?

15  A    I don't know if it's sixteen or less or more, but I

16  know it's a small amount.

17  Q    Very small compared to the total sales.

18  A    Compared to the total sale, yes.

19  Q    And are you aware what your total sales to Wards was in

20  the year 2000?

21  A    Not really.

22  Q    Why not?

23  A    Because it was not part of my job.

24  Q    Is it a fair statement to say that the financial

25  workings of your company was not part of your job?

1    A    Say that again.

2    Q    The financial information from your company, financial

3    information, was that something that you, as president,

4    would be on a day to day basis dealing with?

5    A    No.

6    Q    Who would?

7    A    Lee Rothline.

8    Q    And when it comes to whether or not Wards was paying

9    its bills on time or not, was that something that you would

10   be aware of?

11   A    No.

12   Q    So any testimony that you've given here today

13   concerning that was merely a conjecture on your part?

14   A    Can you ask the question again?

15   Q    Yes.  So any testimony you gave in response to Mr.

16   Schachter's questions was not based on your personal

17   knowledge with respect to how Wards paid its bills?

18   A    Correct.

19   Q    And any testimony you gave regarding any collection

20   efforts made by your firm to collect bills from Wards was

21   not based on your personal knowledge?

22   A    Not direct personal knowledge, yes.

23   Q    Do you have any indirect knowledge of how your company

24   would request payment from Wards?

25   A    Not really.

1   Q    Not really.  Okay.  I'd like you to look at plaintiff's

2   exhibit 52.  Do you have that in front of you?

3            THE COURT:  Now you have to go to the three ring

4   binder.

5   BY MR. STEINFELD:

6   Q    Okay.  Are you there, sir?

7   A    Yes.

8   Q    Okay.  Have you ever seen this document before?

9   A    Yes.

10  Q    Okay.  Well, can you describe it for me?

11  A    It's Montgomery Ward and then there is a number of

12  invoices, an amount and total amount and then the address.

13  The address, yes, name, fax number and name from Joe Cleary,

14  OTC International.

15  Q    Now is this a document that was produced by your

16  company?

17  A    I don't know.

18  Q    You don't know.  Okay.  Do you know who Joe Cleary is?

19  A    Yes.

20  Q    Who is he?

21  A    He was a comptroller of the company.

22  Q    And it says from Joe Cleary.  Do you see that?

23  A    Yes.

24  Q    Okay.  And do you see the date on the top?  Not the

25  first date, but the date below it.  Look at the top left.

1   A    The date, yes.

2   Q    And what is that date if you can read it?

3   A    November 13, 2000.

4   Q    Okay.  And that appears to be the date of this original

5   document, doesn't it?

6   A    I don't know if that's the date for the original

7   document.

8   Q    Okay.

9   A    But I see a date here.

10  Q    All right.  Do you know -- and then you see that it's

11  addressed to attention, Zelda Matthews, do you see that?

12  A    Yes.

13  Q    And a fax number in Chicago.

14  A    I don't know if it's Chicago, but I see numbers.

15  Q    All right.  A 312 area code.

16  A    Yes.

17  Q    Okay.  Do you know who Zelda Matthews is?

18  A    I have no idea.

19  Q    Okay.  Do you know who -- do you recognize any of these

20  invoices as being invoices from your company to Montgomery

21  Ward?

22  A    I don't know if it's from Joe Cleary -- but I don't

23  know.

24  Q    Would Lee Rothline know, in your opinion?

25         MR. SCHACHTER:  Objection.