FILED

OCT 6   10:23

U.S. BANKRUPTCY COURT
FILED
TRENTON, NJ

06 SEP 22 AM 11:20

JAMES J. WALDRON

BY _____
DEPUTY CLERK

1             UNITED STATES BANKRUPTCY COURT
               DISTRICT OF NEW JERSEY

2

- - - - - - - - - - - - - - x

3  IN THE MATTER OF:       :
                        : CASE NO.: 04-4667(RTL)

4  MONTGOMERY WARD, LLC, et al.,: Trenton, New Jersey
                        : July 20, 2006

5           Debtor     :

- - - - - - - - - - - - - - x

6  MONTGOMERY WARD, LLC, et al.,:

7          PLAINTIFFS    :
                        : ADVERSARY PROCEEDING

8         -vs-       : NO.: 02-9282
                        :

9  OTC INTERNATIONAL, LTD.,   :
                        :

10         DEFENDANTS    :

- - - - - - - - - - - - - - x

11

12     TRANSCRIPT OF HEARING RE:  TRIAL TO RECOVER
              PREFERENTIAL TRANSFERS

13     BEFORE THE HONORABLE RAYMOND T. LYONS
         UNITED STATES BANKRUPTCY JUDGE

14

A P P E A R A N C E S:

15

For the Debtor:        ASK FINANCIAL, LLP

16                      BY: JOSEPH L. STEINFELD, JR., ESQ.
                          KAREN M. SCHEIBE, ESQ.

17                      2600 Eagan Wood Drive
                      Eagan, Minnesota 55121

18

For OTC International,  SILVERBERG STONEHILL

19  Ltd:               GOLDSMITH & HABER
                      BY: KENNETH R. SCHACHTER, ESQ.

20                          MITCHELL L. KAPLAN, ESQ.
                      111 West 40th Street

21                      New York, New York 10018.

22

Audio Operator:        Betty Akin

23

- - - - - - - - - - - - - - - - - - - - - - - - -

      **TERRY GRIBBEN'S TRANSCRIPTION SERVICE**

24           27 Beach Road, Unit 4
        Monmouth Beach, New Jersey 07750

25      **(732) 263-0044 - Fax # (732) 263-0075**



I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS | COURT |
|---|---|---|---|---|---|
| JACK WILLIAMS | 3 | 42 | 128 | | 129 |
| WILLIAM SHAFTON | 137 | 159 | 172 | 173 | 174 |
| HOLLY ETLIN | 177/192 | 192 | 203 | | 190 |
| RANDY BROWN | 207 | 248 | 271/280 | 275 | 275 |

EXHIBITS

| NO. | DESCRIPTION | IDENT. |
|---|---|---|
| D-13 | Expert report by Williams | 12 |
| D-14 | Revision to D-15 | 13 |
| P-23 | 12/14/99 vendor letter | 212 |
| P-24 | 1999 audited financial statement | 215 |
| P-25 | 1/00 through 2/00 financial statement | 223 |
| P-27 | 4/30/00 financial statement | 232 |
| P-29 | 7/13/00 vendor letter | 261 |
| P-36 | Summary of financial statements | 232 |
| P-43 | 8/24/00 Brown letter | 273 |
| P-44 | 8/28/00 terms compression impact report | 242 |
| P-53 | to P-55 Graphs of payment patterns | 141 |
| P-56 | to P-59 McCreedy accounting data | 139 |
| P-60 | Expert report by Etlin | 187 |
| P-76 | Graph showing effect of terms change | 156 |

1      THE CLERK:  All rise.  The United States

2 Bankruptcy Court District of Delaware, the Honorable Raymond

3 T. Lyons presiding.

4      THE COURT:  Good morning.  Thank you.

5      MR. STEINFELD:  Good morning, Your Honor.

6      MR. SCHACHTER:  Good morning, Your Honor.

7      THE COURT:  Please be seated.  Thanks.  Mr.

8 Schachter.

9      MR. SCHACHTER:  Yes, Your Honor.  The defense

10 calls Jack Williams.  And Your Honor, if you could affirm

11 rather the swear the witness?

12      THE COURT:  Yes, certainly.

13      WITNESS, JACK WILLIAMS, AFFIRMED

14      THE COURT:  All right.  Please have a seat.

15      THE WITNESS:  Thank you, Your Honor.

16      THE COURT:  All right, Mr. Schachter.

17 DIRECT EXAMINATION BY MR. SCHACHTER:

18 Q    Mr. Williams, for whom are you currently employed?

19 A    At this time I'm currently employed by Georgia State

20 University College of Law in Atlanta, Georgia, where I'm a

21 professor of law there and also B.D.O. Seidman, an

22 accounting and financial advisor and consulting firm in

23 Atlantic and New York, as well as a consultant with the

24 Department of Homeland Security and on occasions, the

25 Department of Defense.

1    Q    Okay.  And has your employment changed since you

2    testified at the consolidated trial of this action?

3    A    No, it has not.

4    Q    Could you tell us your professional and educational

5    background and experience in the field of statistics and

6    statistical analysis?

7    A    Yes, I can.  As I mentioned, I'm a professor at Georgia

8    State University.  In the law school I teach bankruptcy

9    business reorganization, mergers and acquisitions,

10   bankruptcy accounting, law and statistics, law and finance,

11   and tax cases.

12        I'm also a director at B.D.O. Seidman, as I mentioned,

13   an accounting and consulting firm, where I work in the

14   business reorganization or restructuring group.  As a

15   director there I work on numerous engagements in the area of

16   bankruptcy accounting, financial advisory work, tax and

17   statistical consulting in areas of financial fraud, invoice

18   fraud, assurance sampling, valuations, damage modeling and

19   detection of money laundering.

20        We are retained at B.D.O. by debtors in possession, by

21   creditor's committees, by trustees and various vendors in

22   some instances, examiners on bankruptcy work across the

23   board.  We do a large amount of preference work on both

24   sides of the docket, preparing preference detail, including

25   the aging of invoices through the payment details,

1    collecting and/or requesting items such as checks, receipts

2    and clear dates and the like.  We do descriptions of that

3    detail and analysis, statistical analysis of that detail and

4    that's one of my primary areas of responsibility.

5        And before going to work with B.D.O. in 1999, I was the

6    co-developer of a web based platform that offered a

7    preference detail and statistical analysis, a package known

8    a Preference Hawk.  That's a product of Credit Hawk.  The

9    application has been used by trustees and vendors and it

10   continues to be used by trustees and vendors.

11       I'm also a CIRA, the C.I.R.A., a certified in solvency

12   and restructuring advisor.  The CIRA is obtained through a

13   three week program and a battery of three examinations.

14   Among the body of knowledge that's attested in the

15   certification process is the preparation of preference

16   detail and preference analysis.

17            MR. STEINFELD:  Excuse me, Your Honor.   It seems

18   the witness is reading something.  I'm just wondering if

19   he's just reading his testimony or is he testifying.

20            THE WITNESS:  Oh, I'm testifying.  I just have my

21   notes.

22            MR. STEINFELD:  Oh.  Is that okay, Your Honor?

23            THE COURT:  I'll ask the question.  What are you

24   referring to Professor Williams?

25            THE WITNESS:  I'm just referring to my notes, just

1    to move it along.

2              THE COURT:  Any objection?

3              MR. STEINFELD:  Well, not at this stage, but I

4    think later on, unless there is -- I'd like to see the notes

5    then.  It would seem to me that if he's going to be offering

6    testimony from written notes, I think I'd have a right to

7    see them.

8              THE COURT:  Well, I don't think so.

9              MR. STEINFELD:  Okay.

10             THE COURT:  I'm going to overrule the objection.

11   BY MR. SCHACHTER:

12   A    Okay.  Part of the certification process is the

13   examination on the preparation of preference detail,

14   description and analysis of preference detail.  And I

15   received the -- and this is a nationwide examination and I

16   received the gold medal in the CIRA certification

17   examination, which is an award that's given to the person in

18   a particular year that receives the highest mark.

19        I also lecture in the area of preference analysis

20   description and preference detail and have done so with the

21   American Bankruptcy Institute, the American Bar Association,

22   the New York Credit Institute, National Association of

23   Credit Managers and the Commercial Law League of America.

24        I was the inaugural Robert M. Zinman Scholar In

25   Residence of the American Bankruptcy Institute and one of

1    the projects I worked on was statistical analysis and

2    development of statistical models in describing and

3    analyzing preference detail.

4         I'm also the present inaugural scholar in residence for

5    the Association of Insolvency and Restructuring Advisors.

6    And there I do much the same thing, including the

7    development of statistical modeling so that we can detect

8    invoice fraud, other types of financial fraud, money

9    laundering and the like.

10        In 1998 and 1999 I was engaged by the Fulton County

11   Georgia Grand Jury Commission as a statistical consultant

12   and testifying expert in developing statistical models to

13   determine whether there was any racial discrimination in the

14   formation of grand juries in Fulton County.  I was also

15   retained by the City of Atlanta to develop statistical

16   analysis of quality of life crimes and the like.

17        I've testified as an expert in a couple of cases

18   involving statistical analysis, including the <u>Flooring</u>

19   <u>America</u> case before Judge Bihary in Atlanta, where I did an

20   analysis of the preference detail, the statistical analysis

21   and the like.  And I also testified before Judge Bernstein

22   in the Eastern District of New York in regard to valuations

23   and that statistical modeling of solvency analysis.

24        I've also worked as a testifying expert but did not go

25   to trial in cases involving check kiting and financial

1    irregularities where I've developed statistical models to

2    detect unusual financial behavior or abnormal financial

3    behavior.

4        I also have been retained or was retained by the

5    subcommittee of bondholders in the Owens-Corning bankruptcy

6    case where I did an analysis of future claims held by the

7    asbestos claimants.  And that analysis included the

8    statistical modeling and claims estimation.

9        I've written several Bar Review articles and a book on

10   related topics to what I'm going to discuss today,

11   particularly statistical analysis and the general legal

12   area.

13       Since 2004 I've been a special advisor in intelligence

14   analysis and terrorism studies to, as I mentioned, the

15   Department of Homeland Security and in some occasions to the

16   Department of Defense.  In that capacity I developed

17   statistical modeling for purposes of threat assessment,

18   statistical modeling for purposes of minimizing improvised

19   explosive devices or IED contact with U.S. soldiers in Iraq.

20   I also developed threat assessments of various cities for

21   purposes of the allocation of Department of Homeland

22   Security money to the various state and local agencies and

23   statistical analysis and profiling of suspicious activity

24   around, in particular, chemical plants and petroleum plants.

25            THE COURT:  All right.  Anything else regarding

1  Professor Williams qualifications?

2          MR. SCHACHTER:  No, I think we have to move this

3  along, Your Honor.

4          THE COURT:  All right.  Now do you want me to

5  recognize Professor Williams as an expert?

6          MR. SCHACHTER:  Yes, I do, Your Honor.

7          THE COURT:  In what area?

8          MR. SCHACHTER:  Statistics and statistical

9  analysis.

10          THE COURT:  Any objection?

11          MR. STEINFELD:  No, Your Honor.

12          THE COURT:  All right.  I would be glad to do

13  that.

14  BY MR. SCHACHTER:

15  Q     Professor Williams, was B.D.O. Seidman retained by OTC

16  in this prong of the trial?

17  A     Yes, it was.

18  Q     And what was its retention?

19  A     B.D.O. Seidman in this prong of the trial was retained

20  to do essentially a preference detail and analysis of

21  various financial information that was provided by us to OTC

22  as well as A.S.K./Montgomery Wards.  The idea was to, within

23  the scope of retention was to prepare a preference detail,

24  to describe it, to analyze it in a way to understand it.

25  Q     And were you the individual at B.D.O. Seidman who

1  particularly worked on this retention?

2  A    Yes, I was.  I was not the only one.  Mr. Diamato, may

3  he rest in peace, and I actually were retained as the

4  potential and then the experts in the case.  But there were

5  several people who worked under us, as well, at B.D.O.

6  Seidman.

7  Q    And you mentioned that OTC supplied you with certain

8  information.  What type of information did OTC supply you

9  with?

10 A    OTC supplied us with the typical array of information

11 that would be necessary to prepare a preference detail.  It

12 provided information involving invoices, invoice terms, pay

13 dates, check amounts, the aging of receivables.  It provided

14 us other financial information in both what we would call a

15 historical or testing period and the preference period.

16 Q    And if I could turn your attention and ask you to open

17 defendant's exhibit D-15, which is the bound book in front

18 of you?

19 A    Yes, I have it.

20 Q    Okay.  Do you recognize defendant's D-15?

21 A    Yes, I do.

22 Q    And was that some of the information that was provided

23 by OTC that you relied on?

24 A    Yes, it is.

25 Q    And I'd like you to flip to the next exhibit, which is

1   D-16.  Do you recognize that?

2   A     May I have just a minute please?  Yes, I do.

3   Q     And was that also financial information supplied by OTC

4   that you relied on?

5   A     Yes, it is.

6   Q     And did you -- I believe you also said that you

7   reviewed some information that had been prepared by the

8   plaintiff.

9   A     Yes, we did.

10  Q     And what do you recall reviewing?

11  A     I recall reviewing a spreadsheet, aging receivables

12  from the invoice date that identified certain summary or

13  certain payments within certain columns including a

14  historical period and a preference period, breaking them

15  down by percentages, I believe, of payment amount and

16  percentages, I believe, of invoice number.

17  Q     And I'd now like to direct your attention to

18  defendant's 12A.  If you'd look at that.

19  A     Yes.

20  Q     And then go to 12C and finally to 12E.

21  A     Yes.

22  Q     And are those three exhibits information that you also

23  relied on or reviewed?

24  A     Yes, it is.

25  Q     And after reviewing and gathering this information did

1    you prepare any report?

2    A    Yes, we did.

3    Q    And I'd now like to ask you to look at exhibit 13,

4    defendant's exhibit 13.  Do you recognize defendant's

5    exhibit 13?

6    A    Yes, I do.  It is the report that Mr. Diamato and I

7    prepared.

8    Q    And I'd like to now --

9            MR. STEINFELD:  Your Honor, can I just --

10           THE COURT:  Yes.

11           MR. STEINFELD:  Thank you.  This report was in

12   part subject to the motion in limine, the discussions of

13   order of the Court.  And I'd rather not -- I sort of want to

14   discuss it now so I can get a general sense from the Court

15   as to how far we can go into this report.  There are certain

16   segments of the report where this witness gives his opinion

17   concerning the ultimate issue as to what is preferential.

18           I believe the Court has ruled as to those

19   particular portions of the report they're not going to be

20   coming into evidence because of our motion in limine.  And I

21   don't want to jump up and down and object if there's

22   something on a page.  I'm going to assume the discussions

23   will be subject to the Court's ruling on the motion in

24   limine, if that's fair.

25           THE COURT:  Mr. Schachter.

1          MR. SCHACHTER:  I certainly intend to follow Your

2   Honor's ruling.

3          THE COURT:  All right.  Thank you.

4          MR. STEINFELD:  Thank you.

5   BY MR. SCHACHTER:

6   Q    Professor Williams, if you would now turn to exhibit

7   D-14?

8   A    Yes.

9   Q    Do you recognize exhibit D-14?

10  A    Yes.

11  Q    And what is that, sir?

12  A    That's a revision to -- essentially a revision to

13  exhibit 15.

14         MR. STEINFELD:  Your Honor.

15         THE COURT:  Yes.

16         MR. STEINFELD:  We object to D-14 and it was

17  specifically raised in the motion in limine and ruled upon

18  by the Court, because D-14 is basically this witness's

19  opinion as to what he believes is ordinary and not ordinary

20  in this case.  And if you look through it, and I think the

21  Court maybe has already done that, it's replete with that.

22  So I don't see how we can have testimony concerning this

23  particular exhibit today.  And especially just the cover

24  sheet alone talks about in and out and totals and that's

25  this witness's conclusion as to what he feels if he were the

1    trier of fact.

2              MR. SCHACHTER:  What exhibit are you looking at?

3              MR. STEINFELD:  Are you looking at D-14?

4              MR. SCHACHTER:  Yes.

5              MR. STEINFELD:  Well, the first page of D-14 says

6    stratified ordinary course analysis.  It says totals in,

7    out, both in, out.

8              MR. SCHACHTER:  It's statistics.  I mean if you

9    want to voir dire on it, it's statistics.

10             THE COURT:  No, we're not going to have voir dire.

11   This is -- I haven't reviewed this document, but it appears

12   to me to be primarily taking the base data and applying some

13   analysis to that and coming to a conclusion as to what's

14   ordinary and not ordinary.  That conclusion is something

15   that I'll make, but the underlying data the witness can

16   certainly testify as to underlying data.

17             MR. STEINFELD:  I definitely agree with that.  I'm

18   just pointing out that -- and I guess I'll just have to go

19   as I listen to the questions.

20             THE COURT:  All right.  And I'm sure that your

21   expert report treats data similarly, I would imagine.  I

22   haven't looked at it.

23             MR. STEINFELD:  Well, you'll get the -- I don't

24   think so, but that's subject to when the time comes.

25             THE COURT:  Okay.

1   BY MR. SCHACHTER:

2   Q    I'd now like to direct you back to exhibit D-13 and

3   within that, your exhibit 5.

4         MR. SCHACHTER:  Again I'm sorry, Your Honor.  We

5   didn't bate stamp the pages.

6         THE COURT:  Yes, but I was informed previously

7   that there's a footer.

8         MR. SCHACHTER:  Yes, and there's also along the

9   right-hand column it will say it, but there's also a footer

10  on the lower left of all the pages, which say which exhibit

11  it is.

12        THE COURT:  Yes.  Let's see.  All right.  I have

13  exhibit 5, I think.  Okay.

14        MR. SCHACHTER:  Are you ready, Joe?

15        MR. STEINFELD:  Your Honor, I don't have any

16  problem with page 1 on exhibit 5 as far as it appears to be

17  statistical analysis.  If you're going to refer to page 2 of

18  exhibit 5, to the extent that there is, you know,

19  conclusions, especially if you look at the upper boxes, he

20  reaches his conclusions as to what he thinks the exposure

21  should be.  And that, of course, I would think would be the

22  subject of the granting of the motion in limine.

23        The stuff below, when it talks about -- it looks

24  like it would be more statistics, I don't have a problem

25  with that.  So basically it's just the top three boxes and I

1    guess there's a middle box.

2              THE COURT:  All right.

3              MR. STEINFELD:  Okay?

4              THE COURT:  I think I'll be able to sift through

5    it.

6              MR. STEINFELD:  I think you will, too, Your Honor.

7    BY MR. SCHACHTER:

8    Q    Professor Williams, can you explain to us what exhibit

9    5 represents?

10   A    Exhibit 5 is an exhibit that simply lists the summary

11   statistics regarding both the payment activity in the

12   testing or historical period and the payment activity in the

13   preference period.

14   Q    And could you go through that with us?

15   A    Yes.  First, we start again, as I mentioned, through

16   the OTC's input and A.S.K.'s input through the data, we

17   create a historical period and we create a preference period

18   of detail.  And so exhibit 5 ties into exhibits 8 and 10 for

19   purposes of the matter today.

20   Q    When you say exhibits 8 and 10, you mean exhibits 8 and

21   10 to you report?

22   A    That's correct.  I'm sorry.  Exhibits 8 and 10 to the

23   report.  When we were developing the databases, which are

24   the historical period and the preference period, we tally

25   the invoices, we age the invoices and we identify the

1  payments associated with those particular invoices.  Then we

2  also notice that there were vendor charge backs and

3  discounts as well that would have to be applied to the

4  preference amount to get the net preference amount.

5       When we were analyzing the data we were looking at a

6  little over 900 invoices in the preference period -- excuse

7  me, in the testing period and approximately 604 invoices in

8  the preference period.

9       Then we looked at how charge backs were handled in

10  preparing the preference detail by OTC.  OTC had during the

11  preference period, I think something around 26,000 or maybe

12  a little more, I can check -- let me check real quick --

13  about $75,000 in charge backs on about $2.8 million in the

14  large preference amount before you net out the discounts of

15  $360,000 and the charge backs of $75,000.

16       In the preference period you had $75,000 worth of

17  charge backs.  Most of these charge backs in our discussions

18  with OTC, came from the return of goods by Wards.  And OTC's

19  internal records would not assign that particular charge

20  back to a particular invoice.  So they used basically the

21  first in, first applied rule where they would take a charge

22  back and apply it to the first invoice that was listed on a

23  check remittance, for example.  And that's the approach that

24  we take at BDO when we can't tie a particular charge back

25  directly to an invoice.

1  Q    So that's an acceptable and ordinary way of applying

2  those types of charge backs?

3  A    That is correct, particularly in the return of goods

4  situations where oftentimes you can't tie a charge back to

5  an invoice.  OTC's information and approach was that way and

6  that's the approach that we commonly do.  That would leave a

7  large number of invoices, however, that are zeroed out,

8  because during the preference period of the 604 invoices

9  well over 300 are very small amounts.  So they get zeroed

10 out.

11      And so one of the questions is when you do preference

12 analysis, particularly in the preference period, because

13 this is not an issue in the historical period, it's so small

14 there.  But in the preference period when you do a

15 preference analysis and you have charge backs like this that

16 zero out a lot of invoices, but we're looking at a very,

17 very small amount of dollars, do you do an analysis of the

18 entire 604 invoices or do you do an analysis of the ones

19 that are actually paid by check.  We did both.

20      Now what we found is the difference between the two was

21 immaterial.  There was about a $30,000 difference in amount

22 and as I'll show in just a minute, under both analyses the

23 summary statistics hold very strongly across the board.

24 There was essentially no change in payment amount by

25 percentage and a very small change or a change, but an

1    insignificant change in the spread of the data.  Again,

2    because you had over 300 invoices that were paid, there were

3    60 day term invoices that were paid in the preference period

4    that were very, very small.  And I can show you that and

5    that presented an issue for analysis in just developing the

6    data set.

7    Q     Now you said you could show us that.  Where would that

8    be in your report?

9    A     Okay.  If you begin first with exhibit 15 of the

10   report, and this is the actual exhibit 15, not the cover

11   material to exhibit 15, and you look at page 9 of exhibit 15

12   of the report, that's page 9 of 14, if you look at the total

13   of the charge back amounts, you'll see $26,360.19.

14   Q     That's the VCB amount?

15   A     That's correct.  Vendor charge backs.  And those were

16   from return of goods.  If you now go back to page 1 of 14,

17   you'll see check number 5377243 at the bottom.  The check

18   cleared the date of October 11th, 2000.

19   Q     Yes.

20   A     Okay.  When you apply the charge backs, the vendor

21   charge backs consistent with OTC's records and the process

22   that we do when we can't tie it directly to an invoice,

23   you'll see that all of the amounts are very small.  A large

24   number of invoices will be zeroed out by the vendor charge

25   backs.  In fact, the zeroing out goes from 1 of 14 all the

1    way to page 8 or 14 and you can see that by the paid amount

2    column.  It's zero as long as the credits and discounts are

3    exceeding the invoice date.  And ultimately 322 and a half

4    of thereabouts, about 323 invoices would be zeroed out with

5    only $26,000 in credit.  And we're talking about a vastly

6    large amount of alleged preference here.

7            THE COURT:  Give me that number again.  323

8    invoices zeroed out.

9            THE WITNESS:  323 invoices, 322 and a part of the

10   323rd invoice zeroes out.

11   BY MR. SCHACHTER:

12   A    So again the question is if you're actually analyzing

13   payments through the transfers that are being scrutinized,

14   what would you do with these invoices that are zeroed out

15   not by a check necessarily, but zeroed by a credit.  Well,

16   we looked at it both ways and we found that the differences

17   in the summary statistics are not statistically significant.

18   And I'll show you those differences in just a minute.

19       In fact, in two columns, well, in all three columns the

20   weighted mean does not change because on exhibit 3, the

21   three columns for the three different samples, the weighted

22   mean does not change because again, although a number of

23   very small invoices are being zeroed out.  And so whether

24   you consider 266 invoices, the ones that survived the credit

25   or the charge backs, or all 604, it doesn't change the

1   weighted mean.  It only changes the standard deviation in

2   the historical period slightly.

3          So this is an anomaly in the information, the financial

4   information, which is not unusual and something we are

5   accustomed to.  And these invoices, very small amounts, tied

6   up -- remember they're 60 day invoices that were paid in the

7   preference period tied up to the description of the invoices

8   that Rothline testified to yesterday as to those invoices, a

9   large number of small invoices that Ward did not receive

10  according to Mr. Rothline.

11  Q    Why don't we go back now to exhibit 5 of your report.

12  A    Yes.

13  Q    And could you explain if we go down to the area that

14  says statistical summary days past due analysis, that

15  portion of your report.  Could you explain that?

16  A    I certainly will.  We originally aged the invoices from

17  invoice date to check clear date and when doing that we saw

18  a bi-modal distribution, two humps.  And we also were aware

19  that there was a change of terms approximately a little over

20  a month before the preference period.  And the change in

21  terms when we aged from invoice date to pay date, the change

22  in the invoice terms, the stated terms, accounted for

23  virtually all of the variability between the two payment

24  cycles, if you will.

25         In other words, the change in terms from 60 days to 30

1    days, which was a 30 day change in terms, had actually

2    reduced the payment cycle from invoice date to pay date 30

3    days or about 30 days, which would suggest that the terms

4    change had significance between the parties and and that the

5    payments from the due date seemed to be rather stable.

6         So what we then did was after noting that there was a

7    reduction of approximately 30 days in Ward's payment cycle

8    as well as OTC's cash conversion cycle, that's the

9    corresponding relationship with the 30 day reduction in

10   terms, we then aged the invoices from a days past due

11   analysis.

12        When you age the invoices from a days past due analysis

13   you get a distribution and the distribution is slightly

14   positively skewed in that the mean or in that the mode is

15   less than the median and the median is less than the means.

16   So you've got a longer right tail, if you will, in days past

17   due and you can see that graphically in exhibit 4 to my

18   report, in particular exhibit 4, page 1 and page 2, where

19   you see the tail to the right of the average is a longer

20   than the tail to the left.  But the skew is a mild skew so

21   based on my experience we could still go forward with the

22   basic analysis that we would traditionally do in a

23   preference detail.

24   Q    Now you've used terms of mode and weighted mean and

25   mean and could you define those for us?

1   A    Certainly.  The mean is the arithmetic average or

2   arithmetic mean.  That's just a summation of all of the days

3   past due dates divided by the total population.  The mean is

4   a measure of central tendency.  It's benefit is that it can

5   be manipulated mathematically to develop among other things,

6   a confidence interval based on standard deviation.  The mean

7   is also something we're really comfortable with and it's a

8   common descriptive metric.  Batting averages in baseball,

9   for example, are the arithmetic mean.

10       The downside to any mean though is because the mean

11  represents every data point in the data set, every transfer,

12  it's influenced by among other things, out-lyers, things

13  that are clearly from a practical perspective so broad that

14  we would all agree that there was a anomaly.  So an invoice

15  that's paid 500 days past due will have an effect on the

16  mean and will shift that mean towards the right a greater

17  mean.  So that's the downside of the mean.

18  Q    Okay.  And in statistics how do you address that, those

19  out-lyers?

20  A    Well, we can address those out-lyers in one of two

21  ways.  If we're most interested in payment amounts, then the

22  weighted mean is an appropriate way in which to describe the

23  measure of central tendency.  But it's only one statistic.

24  Another way in which to handle the out-lyers is that in the

25  statistical literature and in my experience, out-lyers are

1    generally defined as a value or a data point in a set of

2    data that's greater than four standard deviations from the

3    mean.

4         And one of the ways in which to handle out-lyers is to

5    simply what's known as trim the mean.  That is, to remove

6    the out-lyers but to note that the out-lyers have been

7    removed and then take a look at whether the out-lyers had an

8    effect on the mean itself.

9         We did both here.  We calculated the weighted means.

10   And the weighted mean is simply a measure that recognizes or

11   an assumption really, as assumption to a measure that

12   recognizes that not all transfers should be equally treated.

13   Let's say a payment on a dollar invoices may be very

14   different, should be treated very different than a payment

15   on a $50,000 invoice.  So we calculated that weighted mean

16   based on the dollar amounts actually paid by a particular

17   check associated with a particular invoice.

18   Q    Let me ask you a question at this point because you

19   said that the dollar might affect if it was a smaller amount

20   or a larger amount, and that's why you look at weighted

21   average.  Assuming that we have a computer payment system

22   where invoices are posted, due dates are noted, and then

23   when the due date passes by a computer system the payments

24   are issued.  Would weighted mean have as much of a

25   statistical meaning in that type of system?

1    A    Well, in that type of system, it would still be

2    important but not necessarily as powerful.  And the reason,

3    as an estimator, the reason that may be the case is that the

4    wonderful benefit of an automated check processing system is

5    that once the due date is triggered, the automated system

6    takes over and so we can oftentimes simply look at the

7    distribution of checks and payments and see evidence that

8    would suggest that the payment process was automated with

9    very little human input because oftentimes the bands, the

10   intervals are much tighter, tighter than a human being would

11   do because they take vacations and they are sick sometimes.

12       But all of these estimates that we're talking about

13   right now, which are the central tendency estimates are

14   point estimates.  They're giving you a specific days past

15   due in our example.  They can be used to create an interval.

16   And for a number of reasons in statistical literature and my

17   experience, an interval analysis is a much better approach

18   than picking a specific date.  That is, a point estimate is

19   just one point.  An interval estimate will be a range.

20       Other than -- if I could go then, besides the weighted

21   average we have the median.  And the median is just simply

22   line up all of the days past due from the smallest to the

23   largest and that particular point, like the seesaw, that

24   balances the data set is the median.  The mode is a days

25   past due date that occurred more often than any other days

1  past due date.  All of those, the mean, the weighted mean,
2  the median and the mode are measures of the central tendency
3  or what would a typical days past due number be if we were
4  looking at a point estimate.
5      So if we look at the testing period, the mean is 24
6  days past due, the weighted mean is 29 days past due.
7          THE COURT:  Where are you looking at?
8  A    I'm sorry.  Exhibit 5, the first column, testing
9  period.  It starts with 905 invoices.
10          THE COURT:  All right.
11  A    Okay.  The mean is 24 days past due.  The weighted mean
12  is 29 days past due.  The median is 17 days past due.  And
13  the mode is 14 days past due that occurs about 115 times.
14  Now remember I talked about the zeroing out of invoices
15  because of vendor charge backs.  We analyzed here 905
16  invoices.  The actual number of invoices that we analyzed in
17  the detail that is behind this is 973 invoices.  Now if you
18  calculate the weighted mean based on the 973 invoices you
19  get 29, so no difference in weighted mean.  And if you
20  calculate the median, you get 17 as well.
21      So we see here no difference.  So the question of how
22  we handle the vendor charge backs for purposes of describing
23  the data and for purposes of creating a statistical
24  interval, which is not the same thing as the factual
25  determination or the legal interval, I'm talking just the

1  statistical interval today, is not going to be influenced by

2  in the historical period on that vendor charge back issue

3  that I described, and again, largely because it's very small

4  amounts in relation.

5      If we look at the testing period excluding out-lyers,

6  which is the second column, the mean is -- now we've

7  excluded out-lyers, the mean is 22 days past due, the

8  weighted mean is 28 days past due and the median is 17 and

9  the mode remains as 14, which occurred 115 times.

10     What we did then from a statistical perspective is to

11  develop an interval estimate.  That is, we have a measure of

12  central tendency.  The next step -- you know that is what's

13  the typical days past due date look like.  But the next step

14  was to create now this interval estimate and we do this by

15  using standard deviations, but there are many ways.  One

16  could be the standard deviation.  Another could be quartile

17  approach, bucket it up in quarters.  Another can be a decile

18  approach, bucket it up in tens or even a percentile

19  approach, you know, bucket it up in ones.  What we did here

20  is we show you all of those particular characteristics.

21  Q    What does standard deviation mean?

22  A    The standard deviation is a measure of variability.  It

23  is a measure of the distribution of all of the items in the

24  data set about the mean.  It measures each value, each days

25  past due date against the average and compares those

1    differences and creates a number, a positive number and then

2    measures the distribution.  And smaller standard

3    distributions -- excuse me.  Smaller standard deviations

4    suggest a tighter band relatively speaking and larger

5    distributions or larger standard deviations suggest a larger

6    band.

7    Q    And why is that something that you look at as a

8    statistician?

9    A    As a statistician you're looking at a sample of data

10   and you're trying to describe that sample.  That's what

11   statistics does.  It's simply tries to describe a

12   distribution of numbers.   And you can describe that

13   distribution of numbers by looking at the central tendency,

14   which we talked about, that would be the mean, the weighted

15   mean, the median and the mode.

16       But you can also describe it and should describe it by

17   its distribution because you could have a situation where a

18   distribution of data, two of them that you're comparing have

19   the same mean, but one could have a real tight foot, a big

20   hump for example, and the other could be, if you graph it,

21   could have a very, very long, relatively speaking foot to

22   the data.  So you want to look at from a statistical

23   perspective you want to look at the data in a way that will

24   help you understand not only its central tendency, but its

25   shape, if you will, if you were to graph it.

1    Q    Under the train or back of the train.

2    A    That's correct.  And standard deviation is a common

3    tool because it's a function of the mean, it's commonly

4    accepted within the statistical literature and within the

5    statistical profession as a statistical measure of

6    dispersion.  Then we calculated --

7    Q    Now are you --

8    A    I'm sorry.

9    Q    Go ahead.

10   Q    We calculated the standard deviation for the testing

11   period and that calculation was 31 days.  Now if you added

12   back the charge backs, the invoices that were zeroed out by

13   the charge backs, instead of 31 days you get 34 days,

14   because now you have a little variation because the charge

15   backs do have a slight effect.  But again this is not

16   significant from my perspective.  A standard deviation of 31

17   days for the testing period excluding the out-lyers, you

18   should see a shorter or tighter band, and we do, 22 days.

19   And of course if we bring back in the vendor charge backs,

20   that would go from 22 days to 24 days, again not

21   statistically significant.

22       So at this particular point in time, the common

23   statistical methodology would be to construct a confidence

24   interval.  And within the social sciences, which would

25   include legal scholarship, again I'm speaking specifically

1    on the statistical side, not necessarily legal significance,

2    statistical significance, the confidence interval that's

3    most commonly accepted at a minimum would be two standard

4    deviations from the mean.

5        Two standard deviations from the mean should capture

6    about 95 percent of the data points within the data set.

7    And two standard deviations from the mean will then allow us

8    to conclude with a 95 confidence interval or a P value it's

9    called a .05, that if we find a days past due number that's

10   outside of two standard deviations from the mean, that days

11   past due number cannot be attributed to chance alone.  There

12   has to be something afoot, something significant.  And we

13   would call that statistical significance.

14       So when you construct two standard deviations on the

15   testing period, the general, the full testing period, you

16   get a two standard deviation of 30 days before the due date

17   to 86 days after the due date.  Anything outside of that

18   interval would be statistically significant.  Now I want to

19   reiterate that doesn't mean it's factually significant, yes

20   or no, or legally significant, yes or no.  This is purely

21   statistical significance.

22       If you look at the testing period excluding the

23   out-lyers we would expect again that band to be decreased

24   and it does.  For statistical significance at the .05 level

25   or 95 percent confidence interval, any payment that's

1    outside of 22 days before the due date or outside of 66 days

2    past the due date would be statistically significant.  That

3    is the difference between it and our measure of what the

4    typical average days past due should be that can't be

5    attributed to chance.  Just the general things that we deal

6    with in life, that there has to be something that is at

7    least significant from a statistical perspective.  So that

8    the range then from a statistical perspective is 22 days

9    before the due date to 66 days past the due date.

10       What we then did after building those descriptive

11   statistics, is look at the preference period and ultimately

12   we'll take the statistical descriptive and apply them to the

13   preference period as kind of a template to see whether we've

14   got any statistically significant differences in the

15   results.

16       In the preference period we have an average of 40 days

17   past due, we have a weighted mean of 22 days past due.  And

18   I just want to mention here, if we put back the invoices

19   that were zeroed out from charge backs, the weighted mean is

20   also 22 days past due.  Because again, it's a small number

21   in dollar amount, about $30,000 or so.  The median is 19

22   days, so we see a 2 day difference.  The mode is 18 days,

23   which occurs 26 times.

24       Now when we construct the standard deviation here, we

25   see the standard deviation is 56 days, which is much broader

1  from the standard deviations in both the testing period and

2  testing period excluding out-lyers, which would suggest that

3  on an invoice by invoice basis, as opposed to a dollar

4  basis, what you would have here is a broader distribution of

5  days past due for example -- the broader distribution of

6  invoices as opposed to the actual amounts that are being

7  paid.

8       What we then did at this time though, is take the

9  standard deviate, the confidence interval that we created,

10  which was two standard deviations of 22 days before the due

11  date to 66 days after the due date, which is statistical

12  significance and an acceptable level, and apply them to the

13  preference period.  And we saw what invoices from a days

14  past due perspective would fall within the confidence

15  interval.

16       And that's what, on the next page of exhibit 5, that's

17  what that first box is all about.  If you simply use --

18       MR. STEINFELD:  I'm going to have to again

19  reiterate my objection now because he's now taking

20  statistics and applying them and making an opinion as to

21  what he believes it to be within the range of ordinary.

22       THE COURT:  All right.  What we're going to do is

23  we're going to take the word ordinary course that Professor

24  Williams used in his report and substitute confidence

25  interval.  All right?

1          MR. STEINFELD:  I'm okay with that.

2          THE COURT:  Is that fair?

3          THE WITNESS:  Yes, Your Honor, that's perfectly

4    fair.

5    BY MR. SCHACHTER:

6    A     So that we can create a confidence interval at 95

7    percent of minus 22 days to 66 days past due.  When you do

8    that, in the preference period about 96 percent in amount of

9    the payments fall within that confidence interval.  If I can

10   direct your attention back to exhibit 5, the first page, I

11   just wanted to point out we also did a decile approach,

12   again just as a distribution.

13         THE COURT:  Before you move to that, I just want

14   to look at -- make sure I'm looking at the right things.

15   This 96 percent is shown where?

16         THE WITNESS:  The 96 percent would be on page 2 of

17   exhibit 5.  It would be the approximately 2.2 million

18   divided by the 2.3 million basically under the column there.

19         THE COURT:  The first box on the upper left-hand

20   side?

21         THE WITNESS:  That's correct.  And if we change

22   all that to confidence interval then what would fall in the

23   confidence interval would be $2,297,751.41 or a total

24   alleged preference of $2,395,936.62.

25   BY MR. SCHACHTER:

1    Q    And then you were going to refer back to exhibit 5.

2    You were talking about the lower right-hand?

3    A    Yes, we also have distributions there and if you go

4    from the 1st to the 9th decile, you get during the testing

5    period excluding out-lyers, 11 days to 46 days.  Now you

6    don't have the same confidence interval.  It's less than 95

7    percent.  But it's another way of looking at the

8    distribution of the data.

9         What we then did was to bucket the data, another way in

10   which to assess the actual distribution.  And at the bottom

11   of exhibit 5, page 2, we bucket the data from minus 22 to 0

12   days.  I mean we have total amounts.  Then less than or

13   equal to 23 days before the due date and minus 22 to 0 days

14   and 1 to 25 days, then 26 to 45 days, 46 to 66 days, and

15   greater than 66 days.  Now the minus 22 to 0 days counting

16   from that column, one, two, three, four, four columns, is

17   your confidence interval of .95 or 95 percent.  That's minus

18   22 days to 66 days.

19        We also then took a look at a tighter range, 1 to 45

20   days.  And when we look at 1 to 45 days, during the testing

21   period, and that's the two buckets there, during the testing

22   period in 1 to 45 days you see in the testing period about

23   89 percent in payment was made during the testing period in

24   those two buckets.  And during the preference period it

25   appears to be 92.6 or about 93 percent made during those two

1   buckets as well.

2   Q    Now was there any from a statistical point, was there

3   any anomaly between those two numbers?  In other words, was

4   there any out of the ordinary between the historical period

5   and the preference period?

6   A    We did not see any.  It seemed rather stable as far as

7   a comparison is concerned.  We then created yet a tighter

8   interval or band and that would be in exhibit 6 to my

9   report.  In exhibit 6 to my report we have invoices in a

10  range, it's entitled.  And the range we created now instead

11  of 1 to 45 days was 5 to 35 days.  We got this range by

12  looking at the graphical depictions that we created and also

13  the graphical depictions from A.S.K.'s financial information

14  after we adjusted it from invoice date to pay date to a days

15  past due analysis.  Because they use an invoice date to pay

16  date.

17       When we do that, you'll see that roughly from 5 days to

18  35 days during the testing period you have roughly 75

19  percent of the payments in amounts captured in the interval.

20  And in the preference period you have roughly 93 percent

21  captured within -- that's an amount captured within that

22  period.  And if you look we also did it by percentage of

23  invoices.  85 percent of the invoices during the testing

24  period and 72 percent of the invoices within the preference

25  period.

1      All three are ways in which to use statistical

2  techniques to describe the various intervals.  Statistical

3  significance, however, comes with, as it's generally

4  understood in the profession, comes with the standard

5  deviation and two standard deviations from the mean, the 22

6  days before the due date to 66 days past the due date.  That

7  would be statistical significance at a level of .05 or 95

8  percent confidence interval.

9  Q    During your analysis and review of the payments in the

10 preference period, did you notice that one of the payments

11 was larger than the others?

12 A    Yes, we did.

13 Q    And which payment was that?

14 A    That was a check amount in the preference period.

15 There were 13 checks in the preference period, a check

16 amount of $865,371.67.

17 Q    And did you investigate that further?

18 A    Yes, we did.  First we compared it to the largest check

19 amount during our historical period.  All of this is found

20 on exhibit 5 as well at the bottom.  And the largest amount

21 during the historical period, called the maximum, is

22 $512,885.59.

23        THE COURT:  Where are you on exhibit 5?

24        THE WITNESS:  Exhibit 5, lower left payment

25 analysis at the bottom.

1          THE COURT:  Okay.  Page 1.

2          THE WITNESS:  That's correct.  I'm sorry, Your

3    Honor.  Page 1.

4    BY MR. SCHACHTER:

5    A    So we saw a check that was about $350,000 larger than

6    the largest check during the testing period.

7    Q    And did you further investigate that check, the

8    $865,000 check?

9    A    Yes, we did.

10   Q    And what did you do?

11   A    Well, we looked at a number of things.  We looked at

12   check date and exposure.  We also looked at what invoices

13   were paid by that check.  A large check is suspect when

14   you're doing a preference analysis.  So we wanted to see

15   what were the invoices and the timing of the invoices, that

16   were actually paid by that particular check.  So what we did

17   is went to our detail, exhibit 15, not the cover sheets, but

18   amended exhibit 15.

19   Q    That appears, I believe, as exhibit 14 in the book,

20   defendant's exhibit 14?

21   A    Yes.  But not the first three pages.

22   Q    Okay.  So excluding the first three pages.

23   A    Right.

24   Q    The one that starts, amended exhibit 15.  Then it says

25   preference period checks?

1   A     That's correct.

2   Q     And page 1 of 14?

3   A     That's correct.  The first three pages, just to let you

4   know, are not part of exhibit 15.

5              THE COURT:  All right.  Just for the record.  We

6   start with the tab that's marked D-14.  The first three

7   pages we're going to disregard for the moment.  Page 4 under

8   defendant exhibit 14 is entitled amended exhibit 15 and that

9   refers to the exhibit number from the B.D.O. Seidman report.

10             THE WITNESS:  Yes.

11             THE COURT:  Okay.

12  BY MR. SCHACHTER:

13  A     This is just a preference detail.  This is during the

14  preference period.  And now what we're doing with this

15  particular exhibit, we're matching invoices to the check

16  that paid those invoices, and we identify terms and days

17  outstanding here.  So if you go, excuse me.  If you go to

18  the largest check, which is the check amount of $865,000 and

19  change during the preference period, which is page 11 of 14,

20  you'll see that this invoice paid approximately -- or this

21  check paid approximately 32 invoices.

22        Now we have the terms stated here.  They were all

23  invoices on 30 day terms and we have the days outstanding.

24  And you subtract the days outstanding from the due date and

25  you get the days past due.  And what you get is a range of